HAWAIIAN INDEPENDENT
REFINERY

v.

UNITED STATES.

C.D. 4777;  Court No. 73–10–02750.

United States Customs Court.

Nov. 6, 1978.

Glad, Tuttle & White, Los Angeles, Cal. (Jonathan K. Bellsey and George R. Tuttle, Los Angeles, Cal., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C. (Velta A. Melnbrencis and Susan C. Cassell, Trial Attys., New York City), for defendant.

BOE, Judge:

This case presents a question of statutory interpretation and application with respect to the administration of the Foreign Trade Zones Act, as amended, 19 U.S.C. § 81a *et seq.* A foreign trade zone is "an isolated, enclosed, and policed area, operated as a public utility, in or adjacent to a port of entry, furnished with facilities for lading, unlading, handling, storing, manipu-

lating, manufacturing, and exhibiting goods, and for reshipping them by land, water, or air." 15 C.F.R. § 400.101 (1972). Pursuant to the provisions of section 3 of the Foreign Trade Zones Act, as amended, 19 U.S.C. § 81c,

Foreign and domestic merchandise of every description, except such as is prohibited by law, may, without being subject to the customs laws of the United States, except as otherwise provided in this chapter, be brought into a zone and may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this chapter, and be exported, destroyed, or sent into customs territory of the United States therefrom, in the original package or otherwise; but when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise: * * *.[1]

For purposes of the entry of foreign merchandise and the payment of customs duties thereon, a foreign trade zone is not considered to be a part of the customs territory of the United States. 15 C.F.R. § 400.101 (1972); see also 19 C.F.R. § 146.1(c) (1972). The issue to be resolved in this case is whether foreign merchandise which is used as an integral part of a permissible manufacturing process within a zone, but which never enters the customs territory of the United States, is subject to duty under the Tariff Schedules of the United States.

The merchandise, invoiced variously as "industrial fuel oil," "gas oil," "heavy gas oil," and "light gas oil," was processed from foreign crude oil imported into Foreign Trade Sub-zone 9–A in Oahu, Hawaii and manufactured at plaintiff's oil refinery located therein. The merchandise was then stored and used as needed as a source of fuel for the refinery's operations. The customs service required plaintiff to file consumption entries for the merchandise so used as fuel within the zone [2] and classified the fuel under either TSUS, Item 475.05 as fuel oil testing under 25° A.P.I. (0.125¢ per gallon) or Item 475.10 as fuel oil testing 25° A.P.I. or more (0.25¢ per gallon). The plaintiff protested this decision and claims the merchandise is nondutiable because it never entered customs territory. As an alternative claim, the plaintiff submits that, if dutiable, the merchandise should be classified under TSUS, Item 475.15 as "natural gas, methane, ethane, propane, butane, and mixtures thereof," entitled to free entry.

I

In order to better understand the genesis of the present controversy, it will be helpful

---

1. Immediately following the statutory language quoted in the text, section 3 of the Act contains a proviso which reads in pertinent part:

   Provided, That whenever the privilege shall be requested and there has been no manipulation or manufacture effecting a change in tariff classification, the appropriate customs officer shall take under supervision any lot or part of a lot of foreign merchandise in a zone, cause it to be appraised and taxes determined and duties liquidated thereon. Merchandise so taken under supervision may be stored, manipulated, or manufactured under the supervision and regulations prescribed by the Secretary of the Treasury, and whether mixed or manufactured with domestic merchandise or not may, under regulations prescribed by the Secretary of the Treasury, be exported or destroyed, or may be sent into customs territory upon the payment of such liquidated duties and determined taxes thereon. If merchandise so taken under supervision has been manipulated or manufactured,

such duties and taxes shall be payable on the quantity of such foreign merchandise used in the manipulation or manufacture of the entered article. * * *

   The privilege to which this proviso refers was not requested by the plaintiff in the instant action. Thus, the merchandise in question was listed in the sub-zone as nonprivileged merchandise, see 19 C.F.R. § 146.23 (1972), which under section 3 of the Act could only be appraised and classified and its duties liquidated thereon when "sent into the customs territory of the United States."

   It must be emphasized at this juncture that the determination which the court makes in the instant action is limited to the subject matter merchandise, that is—non-privileged foreign merchandise.

2. The specific merchandise involved in the present action was "entered" between September and November 1972.

to set forth a brief account of the establishment of Foreign Trade Sub-zone 9–A, as well as of the operations of plaintiff's refinery in the zone during which the merchandise in issue was both manufactured and subsequently used. Much, though not all, of this information was presented at the trial of this case through the testimony of plaintiff's sole witness Mr. Paul C. Joy,[3] and by plaintiff's introduction of four documentary exhibits.

## A

In November 1968, the State of Hawaii, as the grantee of Foreign Trade Zone 9 in Honolulu, applied to the Foreign Trade Zones Board[4] for the grant of a permit to establish a non-contiguous sub-zone in which an oil refinery would be constructed by the plaintiff. The proposed refinery was intended to process solely foreign crude oil into semifinished and finished petroleum products, primarily for export. An examiner's committee, appointed by the Board, see 15 C.F.R. § 400.1308–1309 (1972), held hearings on the application in both Honolulu and Washington, D.C. in December 1968, and January 1969, and subsequently filed a report recommending that the application be approved. See 31st Annual Report of the Foreign Trade Zones Board at 4 and n. 1 (1969). The application was formally approved by the Board in April 1970. See 35 F.R. 6672 (1970).

Once the grant was procured, construction of the refinery commenced. Actual refining operations began in April 1972. Shortly before the refinery became operational, however, the plaintiff was informed by customs that the portion of the refinery's product which was to be used for fuel within the sub-zone was considered to be dutiable merchandise. Customs required plaintiff to install a special meter to measure the amount of this fuel and required the filing of periodic consumption entries therefor. See Plaintiff's Collective Exhibit 3.

## B

The merchandise here in issue was manufactured and subsequently used as fuel in a process which began with the unloading of crude oil from a tanker by means of an offshore pipeline which carries the crude to one of several storage tanks inside Sub-zone 9–A. In order to refine the crude oil, it is withdrawn from the storage tank by means of a pump which transports the crude to a crude oil heater. This heater, operated at temperatures of 1500° F and 2000° F, raises the temperature of the crude to a range between 650° F and 700° F. Once this temperature range is achieved, the crude is pumped into a column known as the distillation or fractionating unit. Here the more volatile components of the crude—those with boiling points under 650° F—are vaporized and move up the column and are separated or "fractionated" and then condensed into their respective boiling point fractions. Once condensed, these components, such as refinery gas, naphtha, and kerosene, exit the distillation unit and may thereafter be further refined into finished commercial petroleum products. A fraction of the crude which vaporizes in the distillation unit is so volatile or unstable, however, that it will not condense as it moves up the column. Because it is not economically feasible to store this component in a gaseous form, it is routed back into the crude oil heater furnace, where it is flared and used as the primary source of fuel for the production of heat to run the refinery.[5]

In the distillation unit, the heavier and more stable components of the crude oil—

---

3. Mr. Joy is the vice-president of the plaintiff who conceived the idea for a foreign trade zone refinery and handled all the technical requirements for its establishment.

4. The Foreign Trade Zones Board is the administrative body charged by Congress with the ultimate responsibility for administering the Foreign Trade Zones Act. It is composed of the Secretary of Commerce, who serves as its chairman, and the Secretaries of the Treasury and the Army. See 19 U.S.C. § 81a(b).

5. The customs service has never attempted to impose duties upon this noncondensable fuel gas.

those which will not vaporize at 650° F—move to the bottom of the column. A portion of this hot oil (a combination of light gas oil, heavy gas oil and atmospheric residuum or industrial fuel oil) is withdrawn from the bottom of the column and is channeled to the refinery's feeder tank. As it enters the feeder tank, it is measured by the meter required by customs. This oil in the feeder tank, which is the merchandise involved in this proceeding, is used to provide a secondary source of fuel for the heat required in the refinery's operations. Whereas the volatile, noncondensable fuel gas produced in the distillation unit is used almost immediately as the primary source of fuel, this heavy oil in the feeder tank is used as a supplemental source.

In order to use this oil to produce heat, however, further processing is required. As needed, the oil is withdrawn from the feeder tank by means of a pump which raises the pressure of the oil to 350–400 p.s.i. It is pumped into a steam preheater which reduces the viscosity of the oil (making it more liquefied) by raising its temperature. The nonviscous oil is then pumped into an atomizing device and there is subjected to high pressure steam causing a turbulent reaction which produces a very fine fog of liquid droplets. This atomized fog of liquid oil and steam droplets exits the atomizer through an opening in the burner nozzle into the furnace of either the steam boiler or the crude oil heater wherein it is subjected to intense heat in the burner fire box.[6] As these liquid droplets absorb radiant heat, they decompose or crack and form more basic fuel elements such as methane, ethylene, propane and propylene. The atomized fog of these more basic and now gaseous elements continues to be subjected to intense heat until it reaches its ignition temperature. At this point, air is introduced into the burner through a separate port and its combination with the now gaseous material and the high temperature causes combustion to occur resulting in the release of intense amounts of heat energy which is used in the refinery's steam boilers and crude oil heaters. The gaseous material further decomposes with this release of heat energy into carbon dioxide and water vapor and is released into the atmosphere.

## II

The defendant's argument for the dutiability of the merchandise is predicated upon the fact that the statutory language does not specifically authorize foreign merchandise to be "consumed" as a part of the permissible manufacturing activities within a zone. Thus, contends the defendant, the general rule that all foreign merchandise imported into the United States is subject to duty unless specifically exempted, is controlling herein.

The government's reliance upon the general rule of dutiability with respect to the issues in this case appears to be misplaced. The basis for the defendant's position is found in General Headnote 1 to the Tariff Schedules of the United States, providing that:

All articles *imported into the customs territory of the United States* from outside thereof are subject to duty or exempt therefrom as prescribed in general headnote 3.[7] [Emphasis added.]

It will be noted from the afore-quoted headnote, however, that dutiability is expressly conditioned therein upon the importation of foreign articles "*into the customs territory of the United States * * *.*" From the statutes and regulations relating to trade zones, it appears that a patent distinction is drawn between the boundaries delineating the geographical territory of the United States and the customs territory of the United States. Customs regulations pertaining to foreign trade zones make such a distinction by specifically exempting trade zones from the definition of "customs territory":

---

6. Mr. Joy testified that maximum atomization is important to give the mixture an optimum surface area with which to absorb the radiant heat in the fire box.

7. General Headnote 3 specifies the method for computing the particular rates of duty which apply to merchandise from different countries and insular possessions.

1254

"Customs territory" is the territory of the United States in which the general tariff laws of the United States apply *but which is not included in any zone.* [19 C.F.R. § 146.1(c) (1972). Emphasis added.]

Accordingly, since it is clearly established by all of the evidence as well as conceded by defendant's answer that the subject merchandise never physically entered the customs territory of the United States, it, indeed, would follow that the merchandise is not subject to duty while remaining within the trade zone.

The defendant, however, attempts to avoid this conclusion by advancing the contention that the purpose for the establishment of a foreign trade zone, separate and distinct from "customs territory," is at variance with the general rule of dutiability upon imported foreign merchandise, and that, accordingly, the legislative enactment creating a trade zone must be strictly construed. Such a construction, the defendant argues, dictates that nonprivileged foreign merchandise brought into a trade zone is nondutiable only if its use is in connection with an activity or operation specifically enumerated in section 3 of the Act. Thus, continues the defendant, if it is determined by the customs service that a particular activity is not expressly enumerated by section 3, the provisions of the Act are inapplicable and the merchandise automatically is deemed to be within the customs territory of the United States and subject to duty.

■ Suffice it to say, the acceptance of such a fiction or rationalization for the purpose of justifying the collection of revenue by way of customs duties would do violence to *the express language of the Foreign Trade Zones Act.* Section 3 thereof is prefaced by the all-inclusive statement:

Foreign and domestic merchandise of every description, except such as is pro-

hibited by law, may, without being subject to the customs laws of the United States, *except as otherwise provided in this chapter,* be brought into a zone * * *. [19 U.S.C. § 81c. Emphasis added.]

The foregoing statutory language will permit no other interpretation but that merchandise is not subject to the customs laws while in a zone, unless the Foreign Trade Zones Act authorizes their application.[8] Section 3 does not provide, as the Government would contend, that the customs laws are fully applicable to merchandise within a zone except to the extent that the Act specifically precludes their application. The afore-quoted language clearly attests to the opposite: exemption for merchandise in a zone from the customs laws is the rule; dutiability for such merchandise under the customs laws is an exception which must be specifically provided in some provision of the Act. Unless specifically expressed by the Act to the contrary, the transferal of such merchandise to the customs territory is the occurrence which makes such merchandise dutiable under the customs laws:

* * * [B]ut when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise * * *. [19 U.S.C. § 81c.]

■ Resort to the legislative history of the Foreign Trade Zones Act, and its amendments, confirms the conclusion that foreign merchandise in a zone is not subject to duty until it actually enters the customs territory of the United States. The Act as originally passed in 1934, *see* Act of June 18, 1934, 48 Stat. 999 (1934) (Celler Act), provided for the establishment of the zones and the permissible activities for which the zones could be used. The manufacture and exhibition of merchandise within a zone

8. An example of a limited authorization for the application of the customs laws to merchandise within a zone is the Act's provision for privileged merchandise. Pursuant to this statutory authorization, the owner may request customs to take his merchandise under supervision and to appraise and classify it and liquidate its

*customs duties thereon while the merchandise is still in the zone.* Duties so liquidated are not collected, however, until the merchandise actually enters the customs territory. *See* note 1, *supra.*

As stated in note 1, the merchandise here in issue is *nonprivileged foreign merchandise.*

were expressly prohibited. In 1950, the Act was amended to repeal this prohibition, and thereafter manufacturing and exhibition were expressly permitted. *See* Act of June 17, 1950, 64 Stat. 246 (1950) (Boggs Amendment). The Senate report accompanying the Boggs amendment clearly recognized that the foreign trade zone was a geographical entity separate and distinct from the customs territory.

A foreign-trade zone is an isolated, fenced off, and policed area within or adjacent to a port of entry where foreign merchandise may be landed, stored, repacked, sorted, mixed or otherwise manipulated with a minimum of customs control and without customs bond. *If such merchandise is brought into customs territory,* it is subject to all customs laws and regulations. [S.Rep. 1107, 81st Cong., 1st Sess. (1949); U.S.Code Cong. Serv.1950, p. 2533. Emphasis added.]

In hearings before the House Committee on Ways and Means, the distinct nature of the foreign trade zone was noted by the sponsors of identical bills which were later substantially enacted as the Boggs Amendment. Thus, Rep. Ellsworth Buck, the sponsor of H.R. 6159 (80th Cong., 2d Sess. (1948)) testified:

Reduced to its simplest terms, a foreign-trade zone is a properly protected * * * area which is outside the customs boundaries of the United States. Thus, from a customs angle, a foreign-trade zone is not a part of the United States. [*Hearings on H.R. 6159 and 6160,* Committee on Ways and Means, 80th Cong., 2d Sess. at 5 (1948) (hereinafter *Hearings*).]

The comments of Rep. Emanuel Celler, the sponsor of H.R. 6160, and the moving force behind the enactment of the original Act in 1934, are particularly instructive:

* * * [I]n the manufacture of the article, there may be a considerable quantity of foreign merchandise or articles involved. The importing manufacturer does not have to pay the duty, for example, on the importation of the foreign material. He does not have to pay the duty on the manufactured article containing the foreign material *until it is actually taken out of the foreign-trade zone and placed into customs territory.* [*Hearings, supra* at 16. Emphasis added.]

In view of the fact that Congress, in enacting the Foreign Trade Zones Act and its amendments, has provided for distinct geographical zones separate from our customs territory, the defendant's argument for the dutiability of the instant merchandise which remains within Sub-zone 9–A is without persuasion. Merchandise which does not actually enter the customs territory of the United States is not dutiable under the Tariff Schedules of the United States. *See* General Headnote 1, *supra.*

▪▪▪ In apparent recognition of the distinction made between foreign trade zones and the "customs territory" in the applicable statutes, the defendant advances the alternate theory that foreign merchandise which is "consumed" in a foreign trade zone may be considered to have been "constructively transferred" to the customs territory at the time of its use. As a basis for this contention, the defendant cites several provisions of the customs regulations which allow the constructive transfer of merchandise to customs territory without the present requirement for an actual physical transfer. *See generally* 19 C.F.R. § 146.-47(b)–(f), § 146.48.[9] An examination of these regulations convinces this court that they provide no support for the defendant's position. First, the regulations provide that an application for constructive transfer must be filed with the District Director of Customs, thus making the process a voluntary one on the part of the person who wishes to transfer the merchandise. *See id.* § 146.47(b). Second, and more important,

---

9. Section 146.48 of the Regulations deals with the importation of merchandise such as is involved herein from a foreign trade zone into the customs territory. *See* 19 C.F.R. § 146.48(a)(1) (1972). Subsection (b) of this regulation, *id.* § 146.48(b), provides that the mechanics for the constructive transfer of the merchandise are governed by the provisions of section 146.-47(b)–(f). *See id.* § 146.47(b)–(f).

after the application for the constructive transfer is approved, the merchandise must actually be transferred to customs territory within a specified time period, *see id.* § 146.47(e)(2), or be restored to zone status. *Id.* 146.47(d). No authority is anywhere conferred upon customs to require the involuntary constructive transfer of merchandise which is never intended to, and which does not in fact, actually enter the customs territory of the United States.[10]

■ In holding the merchandise in question to be nondutiable, this court does not attempt to determine the propriety of defendant's major premise, that is—that the use of the oil in the feeder tank as a secondary source of fuel is not permissible under the Act. Even were this court to assume that the use of this secondary source of fuel is not permissible, the fallacy in the defendant's position, however, lies in its postulate that the correction of such a nonpermissible use is effected by the imposition of a statutory duty. From the history of the Act no indication appears that Congress intended this court to become the arbiter of permissible and/or nonpermissible intra-trade zone activity.

■ Congress has charged the Foreign Trade Zones Board with the primary responsibility for administering the Act. *See* 19 U.S.C. § 81a(b). Pursuant to this obligation, the Board has promulgated regulations which must be complied with by an applicant seeking a zone permit. The regulations require the applicant to file an extensive and in-depth series of exhibits setting forth his proposal for the establishment of a zone. *See* 15 C.F.R. § 400.603 (1972). These exhibits must spell out in detail the operations and use to which the zone or sub-zone will be devoted. Where activities are contemplated which are unauthorized under the Act, the Board may either refuse to grant the permit, or may issue the permit upon specific conditions to prevent unauthorized activity. *See id.* § 400.700.

Following the receipt of a satisfactory application for Sub-zone 9–A, the Board

---

10. Forsooth, this has been the position of the customs service, itself. With respect to the consumption entries which it was required to file for the oil contained in the feeder tank, including those involved here, the plaintiff requested that it be allowed to constructively enter the merchandise as a gas since the oil was gasified prior to combustion. In a protest review decision involving different entries from those involved in this action, the customs service denied the plaintiff's request for constructive transfer by pertinently stating:

> With regard to the request for constructive transfer to Customs territory, this type of transfer is not covered in the Foreign-Trade Zones Act, but was devised by Customs as a means of avoiding a double transfer of merchandise; that is, Customs laws do not permit entries for merchandise to be accepted until the merchandise has actually arrived in Customs territory. The Foreign-Trade Zones Act spelled out no authority for merchandise to be entered while still physically in the zone except a limited authority for as much of the entry procedure as is necessary for liquidation in the case of privileged merchandise.
>
> Literal compliance with the law required a physical transfer of the merchandise outside the zone area before it could be entered. After entry, the merchandise could be transferred from its temporary resting place outside the zone to its intended destination. The double handling of merchandise being transferred from a zone into the commerce of the country was so expensive and troublesome that it might have ruined zone business.
>
> The difficulty has been eliminated by the concept that if the importer and zone operator joined in a written request, and the district director approved, the merchandise would be considered as if it had been transferred to Customs territory as of the time of the district director's approval, and all of the rights, liabilities, and procedural requirements which would have arisen in the case of an actual physical transfer would be considered as having arisen by constructive transfer as of the time of the district director's approval. The impractical double handling of the merchandise was thus eliminated.
>
> *As will be seen from the foregoing, constructive transfer was to provide relief in those instances where merchandise was expressly intended to be physically moved into Customs territory and not as to merchandise which could not be, and was never intended to be, physically moved,* as in the case here relating to the gaseous material which was not even created until after the gas oil had actually entered the furnace to be used as a fuel in the operation of the refinery. [*See* Plaintiff's Collective Exhibit 4; 9 Cust.Bull. 746, 749–50, P.R.D. 75–5 (1975). Emphasis added.]

issued the permit authorizing a sub-zone for the specific purpose of establishing an oil refinery. The grant was in no way conditioned upon the use of duty-paid fuel to serve as the source of heat in the refining process. See 35 F.R. 6672 (1970). On the contrary, one of the advantages of the refinery in the sub-zone was that it would be self-contained, not requiring outside sources of fuel for its intended purpose of refining foreign crude.[11] It does not fall within the province of this court to determine in a proceeding of this character that the use of the instant merchandise, as an integral part of the intra-zone refinery operation which was expressly permitted by the Board in issuing the zone permit, constituted an unauthorized activity under the Act.

■ The court's determination of non-dutiability in no way prevents the customs service from taking its case to the Board, if it continues to be of the opinion that the use of the fuel oil in the sub-zone's refining process is unauthorized. One of the Board's own regulations, codified at 15 C.F.R. § 400.807 (1972), contemplates such action by providing:

When it shall be reported to the Board that any goods or *process of treatment* is detrimental to the public interest, health, or safety, the Board shall cause such investigation to be made as it may deem necessary. The Board may order the exclusion from the zone of any goods or *process of treatment* that in its judgment is detrimental to the public interest, health, or safety. [Emphasis added.]

The Board in turn may impose any conditions which it deems advisable upon the continued operation of the refinery in the sub-zone. See id. § 400.700. Such determinations by the Board are judicially reviewable at the request of the parties affected to determine their reasonableness and consonance with the purposes of the Act. See Armco Steel Corp. v. Stans, 431 F.2d 779 (2d Cir. 1970).[12]

■ This court may only observe that no necessary inconsistency exists between the grant of a permit for a sub-zone oil refinery using its own internally produced fuel and the purpose of the Foreign Trade Zones Act to encourage and stimulate the international commerce of the United States. See Fountain v. New Orleans Public Service, Inc., 387 F.2d 343 (5th Cir. 1967). The history of the refinery's first full year in operation indicates that this purpose has been well served. See 35th Annual Report, supra at 1; see also id. at 41. The comments of the United States Court of Appeals in the Armco case are deemed appropriate:

* * * The Act gives the Trade Zones Board wide discretion to determine what activity may be pursued by trade zone manufacturers subject only to the legislative standard that a zone serve this country's interests in foreign trade, both export and import. Because of the nature and complexity of the problem the factors entering into a Board determination are necessarily numerous, and it would seem incontrovertible that the Board must not be unduly hampered by judicial policy judgments that might cast doubt upon the wisdom of a particular Board decision. [Armco Steel Corp. v. Stans, supra at 785.]

11. Plaintiff's witness, Mr. Joy, testified that the refinery was conceived with the idea of using the heavy oil in the feeder tank as an internal fuel for its operations, and not natural gas as domestic American refineries on the mainland would use. The reason for this was twofold: First, Hawaii has no indigenous source of natural gas necessitating shipments from the mainland which would have been prohibitively expensive. Second, and most important, the sub-zone refinery was planned as competition for foreign refineries which do not use duty-paid fuel for their operations. The goal of success-fully competing with foreign refineries was apparently borne out once the sub-zone became operational. See 35th Annual Report of the Foreign Trade Zones Board at 1 (1973) [hereinafter 35th Annual Report].

12. Should the customs service remain dissatisfied with the situation even after a determination by the Board, it may request congressional action to correct any perceived "hole in the tariff wall." See Armco Steel Corp. v. Stans, supra at 784–85.

This court, therefore, finds that the merchandise in question used as a secondary source of fuel in plaintiff's refinery located in Foreign Trade Sub-zone 9–A, Oahu, Hawaii, is not subject to duty under the Tariff Schedules of the United States. The protest of the plaintiff is sustained.[13]

Let judgment be entered accordingly.

---

13. Because the court has determined that the merchandise in issue is nondutiable while it remains in the foreign trade sub-zone, it is unnecessary to address plaintiff's alternative claim that, if dutiable, the merchandise should be classified as a gas.