**NISSAN MOTOR MFG. CORP., U.S.A., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 87–01–00051.

United States Court of International Trade.

Aug. 16, 1988.

Sharretts, Paley, Carter & Blauvelt, P.C., Gail T. Cumins and Ned H. Marshak, New York City, for plaintiff.

John R. Bolton, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Michael P. Maxwell, New York City, for defendant.

DiCARLO, Judge:

Cross-motions for summary judgment, made pursuant to Rule 56 of the Rules of this Court, frame the question of whether machinery imported to produce merchandise in a foreign trade zone subzone should be subject to duty. Nissan Motor Manufacturing Corporation U.S.A. (Nissan) moves for summary judgment requiring the United States Customs Service (Customs) to reliquidate entries of production machinery and related capital equipment and refund over $3,000,000 in duties. The United States moves for summary judgment affirming Customs' assessment of duties.

The Court finds from its review of the Foreign Trade Zones Act and the relevant legislative history that machinery and related capital equipment imported to produce merchandise in a foreign trade zone subzone are subject to duty. Defendant's motion for summary judgment is granted; Nissan's motion for summary judgment is denied.

## BACKGROUND

A foreign trade zone is "an isolated, enclosed and policed area, operated as a public utility, in or adjacent to a port of entry, furnished with facilities for loading, unloading, handling, storing, manipulating, manufacturing, and exhibiting goods, and for reshipping them by land, water, or air." 15 C.F.R. § 400.101 (1988). Among other benefits, foreign trade zones often permit an importer to lessen its liability for duties, or avoid quota problems. The original Foreign Trade Zones Act did not permit merchandise to be manufactured in a zone. In 1950, section 3 of the Foreign Trade Zones Act was amended to provide that:

Foreign and domestic merchandise of every description, except such as is prohibited by law, may, without being subject to the Customs laws of the United States, except as otherwise provided in this chapter, be brought into a zone and may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this chapter, and be exported, destroyed, or sent into Customs territory of the United States therefrom, in the original package or otherwise; but when foreign merchandise is so sent from a zone into Customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise....

19 U.S.C. § 81c (1982).

The Foreign Trade Zones Act is administered by the Foreign Trade Zones Board (Board), which has authority to grant to public and private corporations, as those terms are defined in 19 U.S.C. § 81a(e) and (f) (1982), the privilege of establishing, operating, and maintaining foreign trade zones in or adjacent to United States Customs ports of entry. 19 U.S.C. § 81b(a)

(1982). In 1952 the Board promulgated regulations pursuant to 19 U.S.C. § 81h to authorize "zones for specialized purposes" or "subzones" in areas separate from existing free trade zones "for one or more of the specialized purposes of storing, manipulating, manufacturing, or exhibiting goods" when the Board finds that existing or authorized zones will not serve adequately the convenience of commerce with respect to the proposed purposes. 17 Fed. Reg. 5316 (June 11, 1952), now codified without amendment at 15 C.F.R. § 400.304 (1988). In contrast to general purpose zones where a municipal corporation leases a portion of the zone to firms that subsequently locate within that zone, subzones are generally used by a single firm. deKieffer & Thompson, *Political and Policy Dimensions of Foreign Trade Zones: Expansion or the Beginning of the End?*, 18 Vand.J.Transnat'l L. 481, 492 (1985). Subzones are especially attractive to domestic manufacturers that import component parts or raw materials because the board may authorize subzones for existing or planned production facilities and thus spare manufacturers from relocating facilities to existing or authorized general purpose zones. *Id.*

The Metropolitan Nashville Port Authority applied to the Board on December 18, 1981 for authority to establish a foreign trade subzone at Nissan's vehicle manufacturing and assembly plant in Smyrna, Tennessee.

On February 2, 1982, Nissan requested a Customs ruling under 19 C.F.R. § 177.1(a)(1) regarding its future obligations for duties. Nissan stated that production machinery to be used in the subzone consisted of a highly automated integrated system of industrial robots, automated conveyor and stamping systems, and a complex computerized interface. In the proposed final configuration, Nissan noted that it was uncertain whether the machinery would be capable of full-scale production of motor vehicles, and that machinery needed to be assembled, installed and tested. As a result of these tests, Nissan stated that some or all of the machinery might be returned to the foreign manufacturers, replaced, redesigned, or scrapped as useless.

Upon the facts Nissan presented, Customs decided that production equipment imported into a foreign trade zone is not "merchandise" for purposes of the Foreign Trade Zones Act and is thus dutiable. In Nissan's case, however, Customs deferred assessment of duties on the production machinery until it was completely installed and tested in full-scale production of motor vehicles in the subzone. C.S.D. 82–103, 16 Cust.Bull. 869, 870 (1982).

The Board approved the application for the foreign trade zone subzone, *Resolution and Order Approving Applications of Metropolitan-Nashville Davidson County Port Authority for a Foreign-Trade Zone and Subzone in the Nashville Customs Port of Entry Area,* 47 Fed.Reg. 16,191 (Apr. 15, 1982), and in May of 1982 Nissan began to place in the subzone production equipment valued at approximately $116,-314,883, with over $3,000,000 in assessed duties. *See* Suzman, *An Evaluation of Current Trends in Foreign Direct Investment in the Southeast United States,* 18 Vand.J.Transnat'l L. 247, 257–58 (1985) (description of the Nissan Subzone). The 29 entries involved in this action were filed on June 13, 1983 and liquidated as entered on June 6, 1986. The liquidations were protested on September 3, 1986 and denied on January 8, 1987. The Court has jurisdiction under 28 U.S.C. § 1581(a) (1982).

## DISCUSSION

### 1

▮ The Foreign Trade Zones Act provides that merchandise may be brought into foreign trade zones and "may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this chapter, and be exported, destroyed, or sent into Customs territory of the United States...." 19 U.S.C. § 81c (1982).

The Court finds that the imports in this action are actively used or intended to be used to produce motor vehicles. The imports are thus not stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated or manufactured to be exported, destroyed, or sent into the Customs territory of the United States.

Given the exhaustive list of activities in the 1950 amendment, it would distort the statute's plain language to read in other terms such as "installed," "affixed," "used," "consumed," or "operated." A general rule of statutory construction is that the expression of one thing is the exclusion of the alternative, *expressio unius est exclusio alterius. See United States v. Douglas Aircraft Co.,* 62 CCPA 54, 59, C.A.D. 1145 (1975). None of the activities that Congress identified in its comprehensive list permit installation or operation of production equipment without payment of duties.

In addition to a plain reading of the statute, the legislative history of the 1950 amendment to the Foreign Trade Zones Act is instructive on Congress' intent:

> The first proviso to section 3 of the act of June 18, 1934, now authorizes the appraisement and liquidation of duties on foreign merchandise when it is first admitted to a zone, such duties not to be paid until the merchandise is sent into customs territory. This privilege has not been used by importers, possibly because the proviso also imposes an absolute requirement that the duties be paid within a maximum of 2 years, even if the merchandise is never sent into customs territory. The proposed legislation would modify this proviso in several respects. The importer could secure a finding of the taxes as well as the duties on his merchandise. This finding could be requested either when the foreign merchandise first entered a zone or at any time during its stay in the zone unless and until there was a manipulation or manufacture effecting a change in tariff qualification of the merchandise. The proposed legislation would authorize such a finding, once made, would thereafter govern the dutiable and taxable status of the merchandise whenever it was sent into customs territory, whether or not it had been manipulated or manufactured in the zone in the meantime. The present absolute requirement for payment of duties on merchandise obtaining a privileged status under the proviso would be eliminated. Duties and taxes would be payable in accordance with the finding only if and when the merchandise was sent into customs territory. *The amended proviso would not authorize consumption of merchandise in a zone, but would authorize its exportation or destruction without the payment of the liquidated duties and determined taxes thereon.*

S.Rep. No. 1107, 81st Cong., 2d Sess. (1949), *reprinted in* 1950 U.S.Code Cong. & Admin.News 2533, 2535–36 (emphasis added). Defendant interprets this history to show Congress' intent that zones not be used to completely avoid duties on production equipment that is consumed (used) in the zone.

Defendant's interpretation is further supported by legislative history amending the Foreign Trade Zones Act (P.L. 98–573), which states expressly that under the Act as amended in 1950, the exemption of payment of duties for merchandise imported into a foreign trade zone "does not apply to machinery and equipment that is imported for use (for manufacturing and the like) within a foreign trade zone." S.Rep. No. 308, 98th Cong., 2d Sess. 35, 36, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 4944–45. Although this observation was made in 1984 after the production machinery was imported into the Nissan subzone, the statement dovetails with the legislative history of the 1950 amendment. "While in general it is legislative history prior to and at the time of enactment which is most helpful in ascertaining intention, yet, we [as judges] are not to ignore the legislative history in connection with subsequent congressional consideration of the legislation, incidental to modifying enactments or to reenactments." *Ellis K. Or-*

*lowitz Co. v. United States,* 74 Cust.Ct. 583, 590, 200 F.Supp. 302, 308 (1961), *aff'd,* 50 CCPA 36, C.A.D. 816 (1963). *See also Butler v. United States Dep't of Agriculture,* 826 F.2d 409, 414 n. 6 (5th Cir.1987) (although subsequent congressional statements are worthy of less weight than contemporaneous ones, they are nevertheless entitled to careful consideration as secondarily authoritative expression of expert opinion).

In a Customs Service Decision on production machinery imported from Japan for use in another foreign trade zone, Customs stated that "not every article can be termed 'merchandise.'" C.S.D. 79–418, 13 Cust.Bull. 1627, 1627 (1979). Customs stated that Congress'

> very action of listing the permitted operations rather than simply stating that foreign merchandise could be admitted free of duty was purposeful. The list does not permit an article to be brought into a zone, free of duty, to be used as production equipment to make other articles. The clear intent was to limit the scope of permitted operations is shown in the restriction on the term "manufactured" by the language " * * * except as otherwise provided in this chapter * * *," and in the discussion of the fifth proviso to section 3 in the Senate Report No. 1177, 81 Cong. (September 26, 1949).

13 Cust.Bull. at 1629–30. Customs also found support in Congress' rejection of legislative proposals to specifically permit entry of production equipment into foreign trade zones without payment of duties.

This case is not the first judicial review of the dutiable status of imports in a foreign trade zone subzone. In *Hawaiian Indep. Refinery v. United States,* 81 Cust.Ct. 117, 460 F.Supp. 1249 (1978), *appeals dismissed,* 66 CCPA 135 (1979), crude oil was imported into a foreign trade zone subzone and processed at the oil refinery in the subzone. Some of the processed crude oil was then stored and used as needed as a source of fuel for the refinery's operations. Customs required the plaintiff to file consumption entries for refined crude oil used as fuel within the zone and

classified the fuel under the Tariff Schedules of the United States (TSUS). The plaintiff protested Customs' decision and claimed the refined crude oil was not subject to duty because it never entered customs territory.

The United States Customs Court found from the free trade zone statutes and regulations that distinct lines were drawn between the boundaries delineating the geographical territory of the United States and the Customs territory of the United States. The court stated that:

> Resort to the legislative history of the Foreign Trade Zones Act, and its amendments, confirms the conclusion that foreign merchandise is not subject to duty until it actually enters the customs territory of the United States.

81 Cust.Ct. at 123, 460 F.Supp. at 1254. The court thus agreed that the refined crude oil used as a secondary source of fuel in the subzone refinery was not dutiable:

> In view of the fact that Congress, in enacting the Foreign Trade Zones Act and its amendments, has provided for distinct geographical zones separate from our customs territory, the defendant's argument for the dutiability of the instant merchandise which remains within Sub-zone 9–A is without persuasion. Merchandise which does not actually enter the customs territory of the United States is not dutiable under the Tariff Schedules of the United States.

*Id.* at 124, 460 F.Supp. at 1255. The dicta in *Hawaiian Indep. Refinery* indicates that the Court reached its decision strictly on a territorial interpretation of the Foreign Trade Zones Act.

Defendant distinguishes *Hawaiian Indep. Refinery* on the basis that while refined crude oil is merchandise within the meaning of the Foreign Trade Zones Act, production equipment is not merchandise because Congress' exhaustive list of permissible operations does not permit an article to be brought into a zone, free of duty, to be used as production machinery to make other articles.

As a matter of public policy, defendant states that Congress did not intend to place

domestic manufacturers or sellers of production machinery at a competitive disadvantage with foreign-manufactured production machinery that could be imported without duty for foreign trade zones and sold cheaper.

The Court finds that the exhaustive list of permitted activities and the relevant legislative history show that foreign-manufactured machinery imported to manufacture goods in a foreign trade zone are not exempt from duty.

2

■ Noting that *Hawaiian Indep. Refinery* stated that "merchandise is not subject to the customs laws while in a zone, unless the Foreign Trade Zones Act authorizes their application", 81 Cust.Ct. at 122, 460 F.Supp. at 1254, defendant also argues that the Act authorizes application of the tariff schedules to Nissan's production equipment because the Board specifically contemplated payment of these duties in creating Nissan's subzone. Defendant asserts that because the Board is directed to "prescribe such rules and regulations ... as may be necessary to carry out" the Act, 19 U.S.C. § 81h (1982), Nissan cannot avoid payment of duties on its production equipment.

Defendant asserts that Nissan implicitly acknowledged its obligation to pay duties on production equipment in the "formal and complete application to establish a foreign trade zone" and a "Basic Plan for the FTZ System" which were submitted in May of 1982. *Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment*, at 21–23. Defendant asserts "[t]hese documents define the scope of the zone granted by the Board." *Id.* at 23.

Without addressing the Board's authority to condition the granting of a zone or subzone on the payment of duties on production equipment, the Court finds that the Board did not condition the grant of Nissan's subzone on any implicit promises in the May documents to pay duties. The Court reaches this conclusion because the Board had already adopted its "Resolution

and Order" on March 30, 1982, and delivered its "Grant of Authority" on April 2, 1982. Both documents were then published in the *Federal Register. Resolution and Order Approving Applications of Metropolitan-Nashville Davidson County Port Authority for a Foreign-Trade Zone and Subzone in the Nashville Customs Port of Entry Area,* 47 Fed.Reg. 16,191 (Apr. 15, 1982). Contrary to defendant's assertion that "[t]he Board's grant of the Port Authority's and Nissan's application plainly required the payment of duties on production equipment," *Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment,* at 23, the Board required Nissan to abide by only the "provisions, conditions, and restrictions of the Act and the regulations issued thereunder," as well as certain "express conditions and limitations" enumerated in the grant. 47 Fed.Reg. at 16,-191. Nowhere did the Board "plainly require" Nissan to pay duty on production machinery remaining in the zone.

Nissan states defendant is confusing the actions of the Board and Customs, because the Board's decision to approve Nissan's subzone is totally unrelated to the subsequent manner in which Customs required Nissan to enter production machinery into the zone. Regarding the actions of Customs, Nissan states that its ruling request in February of 1982 acknowledged that in C.S.D. 79–418, 13 Cust.Bull. 1627 (1979), Customs had limited *Hawaiian Indep. Refinery* to the facts of that case. Therefore, Nissan based its claim on the realization that C.S.D. 79–418 could only be overturned by appeal to the Court of International Trade. Similarly, in Nissan's "Basic Plan for FTZ System Design" and Customs Form 216, Nissan states that it accepted the fact that Customs would not allow an importer to bring production machinery into a foreign trade zone free of duty:

In this regard, there is absolutely no requirement that a party wishing to challenge a Customs Service decision indicate its disagreement with Customs at the time of entry. Importers routinely enter

merchandise in the manner required by Customs, and the protest liquidation of entries pursuant to Section 514, Tariff Act of 1930, as amended. These normal Customs procedures apply to FTZ merchandise, as the Government itself has acknowledged by admitting that this court has jurisdiction over the entries in issue. Thus, the fact that a Zone applicant computes the economic benefit to be derived from an FTZ based on Customs' position at time of entry does not bar the Zone grantee from challenging that position through litigation.... [Nissan] is not precluded from challenging Customs position as to the dutiability of production machinery merely because [Nissan] correctly recognized that it would be futile to convince the Customs Service to overturn its position, and that it therefore would be required to challenge Customs' decision in the CIT.

*Plaintiff's Response to Defendant's Statement of Material Facts,* at 12–14.

Similar to where the Court of International Trade has not required plaintiffs to argue before an agency that the agency should not apply its own regulation, *Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 135, 583 F.Supp. 607, 610 (1984), the Court finds that Nissan complied with Customs' requirements in order to preserve its right to judicial review in this Court after denial of a protest rather than subject itself to a finding of estoppel.

Regarding actions of the Board, the Court finds that Nissan's December 18, 1981 application to the Board made no reference to the dutiable status of production machinery and the Board's grant of authority neither restricted Nissan's right to enter production machinery into the zone without paying duty nor conditioned the grant on Nissan's waiving its right to challenge Customs' entry requirements by filing a protest against liquidation and commencing an action in this Court to challenge denial of the protest. The situation is similar to *Hawaiian Indep. Refinery,* where the court found the Board's grant of authority "was in no way conditioned upon the use of duty paid fuel." 81 Cust.Ct. at 126, 460 F.Supp. at 1257.

The documents accompanying the motions for summary judgment do not support defendant's second argument that Nissan must pay duties because it agreed to do so or was required to do so in the Board's grant of authority. However, the failure of defendant's second argument does not defeat the success of its first argument based on the statute and legislative history.

### CONCLUSION

Based on the language of the Foreign Trade Zones Act, as amended, and the relevant legislative history, the Court holds that production machinery and related capital equipment are dutiable. Customs' determination to assess duties on the production machinery is affirmed. Nissan's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Judgment will be entered accordingly.