83 F.3d 397
 18 ITRD 1257
 CITGO PETROLEUM CORPORATION and Lake Charles Harbor And
Terminal District, Plaintiffs-Appellants,
v.
THE UNITED STATES FOREIGN TRADE-ZONES BOARD; Mickey Kantor,
Secretary of Commerce, as Chairman and Executive Officer of
the Foreign-Trade Zones Board; Robert E. Rubin, Secretary
of the Treasury, as a Member of the Foreign-Trade Zones
Board; Togo D. West, Jr., Secretary of the Army, as a
Member of the Foreign-Trade Zones Board; and Executive
Secretary of the Foreign-Trade Zones Board, Defendants-Appellees.
 No. 95-1390.
 United States Court of Appeals,
Federal Circuit.
 May 3, 1996.
 
 Appealed from: U.S. Court of International Trade; Judge Carman.
 William F. Demarest, Jr., Holland & Hart, Washington, D.C., argued for plaintiffs-appellants. With him on the brief were Adelia S. Borrasca, and Charles M. Floren, CITGO Petroleum Corporation, Tulsa, Oklahoma.
 Susan Burnett Mansfield, Commercial Litigation Branch, Civil Division, Department of Justice, New York City, argued for defendants-appellees. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Washington, D.C., and Joseph I. Liebman, Attorney in Charge, International Trade Field Office. Of counsel was Robert J. Heilferty, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, D.C.
 Before CLEVENGER, SCHALL and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 Appellant Citgo Petroleum Corp. sought to have one of its oil refineries designated a "foreign-trade subzone" in order to obtain favorable treatment under the customs laws. The United States Foreign-Trade Zones Board approved the request subject to the condition that import duties be paid on foreign crude oil used as fuel in the refinery. The plaintiffs challenged the imposition of that condition, but the Court of International Trade upheld the Board's action. We affirm.
 
 
 2
 * Congress has authorized the creation of certain areas within the United States, known as foreign-trade zones, which are accorded special treatment under the customs laws. The Foreign-Trade Zones Board is responsible for designating the foreign-trade zones and foreign-trade subzones, which are foreign-trade zones created for a single business enterprise.
 
 
 3
 Businesses operating within foreign-trade zones or subzones are given favorable customs treatment with respect to merchandise they bring into the zones from abroad. For example, a company that ships raw materials into a foreign-trade zone, processes the raw materials into finished products, and then exports the finished products is not required to pay duties on the raw materials, as they are deemed never to have entered the customs territory of the United States. Similarly, a company that ships raw materials into the zone, manufactures finished products in the zone, and imports those products into the United States may be eligible to pay duties on the finished products rather than the (often higher) duties that would otherwise be assessed on the raw materials. See Armco Steel Corp. v. Stans, 431 F.2d 779, 782, 784-85 (2d Cir.1970).
 
 
 4
 Citgo operates a refinery in Lake Charles, Louisiana. The company ships foreign crude oil to the refinery, performs refining operations on it, and sells the refined products in the United States and abroad. Not all of the refined products leave the refinery, however. After the crude oil goes through the first refining stage, some of the resulting product is used to fuel the refinery itself. It is the customs treatment of that consumed fuel that is at issue in this case.
 
 
 5
 In 1986, the Lake Charles Harbor and Terminal District submitted an application to the Foreign-Trade Zones Board on behalf of Citgo, requesting that the Board create a subzone consisting of Citgo's Lake Charles refinery. The Board approved the subzone in 1989, subject to several conditions. One of the conditions, the so-called "fuel-consumed condition," required Citgo to pay import duties on the portion of the imported crude oil that was ultimately used to fuel the refinery operations. Citgo began operating under the benefits of the subzone grant, but it challenged the lawfulness of the fuel-consumed condition, arguing that the Board was not authorized to impose such a condition and that its imposition in Citgo's case was arbitrary and capricious. After an initial decision and appeal to this court on a jurisdictional issue, see Conoco, Inc. v. United States Foreign-Trade Zones Bd., 790 F.Supp. 279 (Ct. Int'l Trade 1992), rev'd, 18 F.3d 1581 (Fed.Cir.1994), the Court of International Trade directed the Foreign-Trade Zones Board to explain why it had imposed the fuel-consumed condition and a second condition that is no longer at issue, Conoco, Inc. v. United States Foreign-Trade Zones Bd., 855 F.Supp. 1306 (Ct. Int'l Trade 1994). On remand, the Board explained that it had concluded that allowing Citgo to use duty-free foreign crude oil in the refining process would be contrary to the public interest because it would give Citgo an unfair competitive advantage over domestic refiners.
 
 
 6
 The Court of International Trade affirmed in a comprehensive opinion. Conoco, Inc. v. United States Foreign-Trade Zones Bd., 885 F.Supp. 257 (Ct. Int'l Trade 1995). The court held that the Board's authority to restrict subzone activities that are contrary to the public interest justified the fuel-consumed condition. The court also rejected Citgo's argument that the Board's decision to impose the fuel-consumed condition was arbitrary and capricious; the court noted that the Board found the condition to be in the public interest based on input from government analysts as well as other domestic refiners.
 
 
 7
 Just before the court issued its decision, the Board created a subzone for a refinery operated by Amoco Oil Company, but the Board imposed different conditions on Amoco than it had imposed on Citgo. Under Amoco's grant, fuel consumed in the subzone was still subject to duty, but the Board permitted Amoco to elect "nonprivileged foreign status" for crude oil used as fuel in the refining process. 60 Fed.Reg. 13,118 (Mar. 10, 1995). The effect of the change in the condition regarding consumed fuel was to reduce the duty rate for crude oil used as fuel to the duty rate for refined fuel, which is zero.
 
 
 8
 In response to the Amoco subzone decision, other refineries applied to have their subzone grants amended to mirror the Amoco conditions. The Board granted each of those requests, including one filed by Citgo. See 60 Fed.Reg. 41,054 (Aug. 11, 1995). Because of the new subzone condition, Citgo modified its challenge to the fuel-consumed condition by requesting only retroactive relief.
 
 II
 
 9
 Citgo argues that the fuel-consumed condition imposed on Citgo violated the Foreign-Trade Zones Act, 19 U.S.C. §§ 81a-81u. In the alternative, Citgo contends that even if such a condition could be imposed in a proper case, the Foreign-Trade Zones Board acted both without a sufficient basis in the record and in a discriminatory manner when it imposed the fuel-consumed condition in this case.
 
 
 10
 * Section 3 of the Foreign-Trade Zones Act, 19 U.S.C. § 81c, exempts from duty merchandise that is brought into a subzone for certain purposes. In Nissan Motor Mfg. Corp., U.S.A. v. United States, 884 F.2d 1375, 7 Fed. Cir. (T) 143 (Fed.Cir.1989), this court held that merchandise brought into a foreign-trade zone or subzone for a purpose other than one of the purposes enumerated in section 3 is not eligible for the favorable duty treatment accorded by the Act. The court in Nissan noted that one of the purposes that is outside the scope of the Act is consumption, so that an item that is brought into a zone or subzone to be consumed there is not entitled to statutory benefits. 884 F.2d at 1377, 7 Fed. Cir. (T) at 146-47. In this case, both the Board and the Court of International Trade found in light of Nissan that the crude oil used to make refinery fuel did not qualify for statutory benefits, because it was consumed in the zone, a purpose that the court in Nissan specifically identified as non-statutory.
 
 
 11
 * Citgo seeks to distinguish Nissan by noting that the portion of the crude oil that was used to power the refinery's operations went through some refining before it was used as fuel. Unlike the machinery at issue in Nissan, Citgo argues, the fuel was brought into the subzone for an approved statutory purpose--manufacturing. That interim purpose, according to Citgo, qualifies the fuel for subzone treatment, even though the ultimate disposition of the fuel--consumption--is not within the scope of the statute.
 
 
 12
 We find it unnecessary to decide whether the Foreign-Trade Zones Act provides an exemption from customs duty for crude oil that is partially refined and then consumed in a foreign-trade zone. Instead, for the reasons given below, we conclude that even if the statute exempts refinery fuel from duty under those circumstances, the Foreign-Trade Zones Board was authorized to impose conditions, including the fuel-consumed condition, on Citgo's operations within the Lake Charles subzone.
 
 2
 
 13
 Congress granted the Foreign-Trade Zones Board very broad regulatory authority over foreign-trade zones and subzones. See Armco Steel Corp., 431 F.2d at 785, 788. Although the statutory provisions that authorize the Board to regulate zone grants do not explicitly grant the Board the authority to condition zone grants, the statute authorizes the Board to "order the exclusion from the zone of any goods or process of treatment that in its judgment is detrimental to the public interest," 19 U.S.C. § 81o(c), and to "prescribe such rules and regulations not inconsistent with the provisions of [the statute]," id. § 81h. At the time the Citgo subzone was authorized, the Board's regulations provided that "[s]pecial conditions applicable to a particular zone may be required by the Board and inserted in the grant for that zone." 15 C.F.R. § 400.702 (1988).
 
 
 14
 We agree with the government that the Foreign-Trade Zones Act authorized the Board, upon finding it in the public interest, to offer a grantee such as Citgo the right to some, but not all, of the benefits of a zone. As the Court of International Trade pointed out, the Board could have denied the subzone grant to Citgo, or it could have conditioned the subzone grant by prohibiting Citgo from using foreign crude oil to fuel the refinery. Imposing a condition that limited the subzone benefits for foreign crude oil used as fuel was a less restrictive measure that both offered Citgo some subzone advantages and at the same time was tailored to avoid disadvantaging Citgo's domestic competitors. Such a condition was clearly authorized by 19 C.F.R. § 400.702 (1988) and was "not inconsistent with the provisions" of the Foreign-Trade Zones Act, see 19 U.S.C. § 81h.
 
 
 15
 Contrary to Citgo's characterization, this is not a case in which the Board is "impos[ing] duties as it deems appropriate" notwithstanding a statutory exemption. Instead, it is more properly viewed as a case in which the Board has conditioned the grant of subzone status on Citgo's acceptance of less than all the benefits that subzone status might otherwise confer.
 
 
 16
 Our conclusion is supported by the decision of the Customs Court in Hawaiian Independent Refinery v. United States, 81 Cust.Ct. 117, 460 F.Supp. 1249 (1978), a case on which Citgo heavily relies for its argument that the statute exempts Citgo's refinery fuel. Although the Customs Court held that the statute did not authorize the Customs Service to collect duties on fuel consumed by a refinery within a foreign-trade zone, the court was careful to note that its holding did not restrict the authority of the Foreign-Trade Zones Board to condition a subzone grant in a way that would achieve the same result. The court noted that the Board had not conditioned its grant "on the use of duty-paid fuel to serve as the source of heat in the refining process" and added that the Board "may impose any conditions which it deems advisable upon the continued operation of the refinery in the subzone." 460 F.Supp. at 1257. The court's analysis thus supports the Board's authority to require a refinery to pay duty on the fuel consumed in the zone as a condition of its enjoyment of other foreign-trade zone benefits. We agree with that analysis and conclude that the Board acted consistently with the statute and regulations when it made the subzone grant to Citgo subject to the fuel-consumed condition.
 
 B
 
 17
 Citgo next argues that the fuel-consumed condition was not justified by anything in the administrative record and that the Board failed to provide a sufficient explanation for imposing that condition. We disagree. The record reflects that the Board had reasonable grounds for concern that granting unconditional subzone benefits to Citgo would be unfair to other domestic refiners, and the Board's remand determination adequately explains why the Board conditioned Citgo's subzone grant as it did.
 
 
 18
 At the time of the original Citgo authorization, the Board was concerned that the potential injury to domestic refiners from granting unconditioned subzone status to Citgo and other subzone refiners would exceed the potential benefits to United States foreign commerce. In particular, the Board explained, imports of refined petroleum products were very low, and the Board concluded that the tariff benefit for consumed fuel would likely disadvantage Citgo's domestic competitors without yielding any significant positive effects such as increasing exports or displacing imported products. That explanation was sufficient to satisfy any obligation on the Board's part to account for its decision to condition its grant of subzone benefits to Citgo.
 
 
 19
 In challenging the merits of the Board's finding that unconditioned subzone benefits would harm the domestic refiners, Citgo points to a report prepared for the Board by the Commerce Department's Office of Energy. According to Citgo, that report establishes that the Board was unwarranted in concluding that allowing Citgo duty-free consumption of foreign crude oil in its subzone would give it a competitive advantage over other domestic refiners. Taken as a whole, however, the report supports the Board, not Citgo.
 
 
 20
 The portion of the report on which Citgo relies stated that "[t]here is a small competitive advantage of FTZ refiners over non-FTZ refiners through the exemption of duties on refinery fuel, but it is not likely to have any discernible effect on competition." Elsewhere, however, the report made clear that while the competitive advantage a refiner would gain from duty-free treatment of foreign crude oil consumed as refinery fuel was "not so large as to cause basic competitive restructuring," the competitive advantage was "nonetheless an advantage that must be taken into account." In a separate memorandum, the Office of Energy concluded that "[t]he potential adverse impact of FTZ refiners over non-FTZ refiners is the principal concern of the Office of Energy, because the granting of duty-free treatment of refinery fuel gives FTZ refiners a small but clear financial edge over non-FTZ refiners." In light of those observations, we reject Citgo's contention that there was no support in the administrative record for the Board's finding that it was in the public interest to qualify Citgo's grant of subzone benefits by imposing the fuel-consumed condition.
 
 C
 
 21
 Citgo's final contention is that the Board acted arbitrarily and capriciously when it imposed the fuel-consumed condition after having previously granted subzone benefits to several refineries without imposing that condition.
 
 
 22
 Prior to 1986, the Board approved five refinery subzones without imposing a fuel-consumed condition. Two of the refineries were located off the U.S. mainland, in Hawaii and Puerto Rico, and their sales were largely confined to the local and export markets. Because those refineries did not have access to the continental pipeline system, they did not compete in the mainland U.S. market on an equal footing with mainland refiners. Of the three subzones authorized in the continental United States--all in Corpus Christi, Texas--only two were activated. Domestic refiners raised no opposition to any of those five subzone applications, and thus the Board did not commission a study of the impact on domestic industry from the duty-free treatment of foreign crude oil in those refineries.
 
 
 23
 The next refinery subzone authorized by the Board was in 1988 for the TransAmerican Natural Gas Corporation refinery in Destrehan, Louisiana; at that point the Board for the first time imposed the fuel-consumed condition on refinery operations in a subzone. The condition was imposed mainly out of concern to avoid unfairness to domestic refiners, who opposed allowing the subzone refinery duty-free treatment of foreign crude oil consumed within the subzone. That opposition triggered an Office of Energy study and report on which the Board relied to impose the fuel-consumed condition on TransAmerican and the next ten refinery subzone grants, including Citgo's.
 
 
 24
 Citgo argues that the Board should have either made the post-1986 subzone grants unconditional or amended the pre-1986 subzone grants by imposing the fuel-consumed condition on those refineries. Treating Citgo differently from the pre-1986 subzone grantees--particularly the two activated Corpus Christi refineries--is discriminatory, Citgo maintains, and thus constitutes arbitrary and capricious administrative action.
 
 
 25
 To accept Citgo's argument would impose an unprecedented restraint on agency action. The argument is not limited to the disparate treatment of similarly situated parties whose cases are under consideration at the same time, but is broad enough to prevent an agency from changing its policies or practices unless it simultaneously revisits all similar prior rulings and changes them as well. We are aware of no principle of administrative law that places such severe limitations on an agency's freedom to make changes in its licensing practices over time. See Capital Cities Communications, Inc. v. FCC, 554 F.2d 1135, 1139 (D.C.Cir.1976).
 
 
 26
 In any event, the circumstances surrounding the pre-1986 and post-1986 subzone applications differ significantly. The subzone grants to the Corpus Christi refineries were made unconditional in part because of the absence of opposition from domestic refiners, as the Board explained in its remand determination. As the Board further explained, it did not specifically authorize a fuel-consumed benefit in the pre-1986 subzone grants. At the time those grants were made, the Board regarded the question whether tariffs could be collected on consumed fuel to be a matter for the Customs Service to resolve through litigation; the Board chose not to address that issue through explicit conditions on the subzone grants. When the post-1986 subzone grants were made, the Board concluded that, in light of court decisions and pending litigation on the dutiability of goods consumed in a foreign-trade zone, the consumed fuel issue should be explicitly addressed in the subzone grants.
 
 
 27
 In particular, the administrative record makes clear that in 1988 the Board concluded that it should begin including a fuel-consumed condition in its refinery grants in part because of the position the Justice Department was taking in the Nissan litigation. Citgo discounts that explanation by arguing that at the time of the Citgo subzone grant, the government's position in the Nissan litigation was not inconsistent with granting consumed fuel benefits to subzone refiners. That argument, however, misconstrues the government's position in Nissan. While the Department of Justice distinguished the case of consumed refinery fuel in its appellate brief in the Nissan case, the government did not take the position that crude oil that is used as fuel is permanently exempt from duties as long as it undergoes some refining within the foreign-trade subzone before it is consumed. Rather, the government conceded only that crude oil that enters a subzone for refining is not subject to "immediate application of the Customs laws." Thus, the government did not disclaim its general position that the Foreign-Trade Zones Act does not confer tariff benefits on goods that are consumed in a foreign-trade zone.
 
 
 28
 Finally, the record makes clear that the Board's treatment of the consumed fuel issue was part of an evolving policy, informed by the Board's experience over a period of more than a decade. In 1988, the Board's Examiners Committee specifically noted that if the Board continued to deny the consumed fuel benefit to subzone refineries, "it might be necessary for the Board to review the five refineries which were approved prior to [1986] to revisit this benefit in terms of current public interest considerations." That is exactly what the Board did in 1995 when it revised the fuel-consumed condition so that all foreign-trade zone refineries were treated the same with respect to that factor.
 
 
 29
 Under these circumstances, it was not unreasonable for the Board to impose the fuel-consumed condition on refinery grants issued after 1986 without simultaneously modifying the pre-1986 grants. To be sure, there may be instances in which a new policy may not be adopted without retroactively revising prior rulings. This, however, is not such a case. Not only did the circumstances change between the time of the two Corpus Christi subzone grants (in 1985) and the time of the eleven subsequent refinery subzone grants (between 1988 and 1993), but Citgo has acknowledged (in arguing against the reasonableness of the fuel-consumed condition) that the consumed fuel benefit had only a minimal effect on competition among refiners. Citgo has thus not shown that the Board acted arbitrarily by failing to impose the fuel-consumed condition on the two Corpus Christi refiners at the time of Citgo's subzone grant in 1989.
 
 
 30
 AFFIRMED.