CONOCO, INC., et al., Plaintiffs,

v.

**UNITED STATES FOREIGN-TRADE ZONES BOARD, et al., Defendants.**

**Slip Op. 95–62.
Court No. 90–06–00289.**

United States Court of International Trade.

April 13, 1995.

Holland & Hart, Washington, DC (William F. Demarest, Jr., and Adelia S. Borrasca) and Lisa L. Bagley, Houston, TX, for plaintiff Conoco, Inc.

Charles M. Floren, Tulsa, OK, for plaintiff Citgo Petroleum Corp.

Frank W. Hunger, Asst. Atty. Gen. of the U.S.; Joseph I. Liebman, Attorney-in-Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Carla Garcia–Benitez); Robert J. Heilferty, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

**OPINION**

CARMAN, Judge:

Plaintiffs move for judgment upon the agency record pursuant to U.S.CIT R. 56.1 to challenge certain conditions imposed by the United States Foreign–Trade Zones Board (FTZB or Board) upon the grants of foreign-trade subzones to plaintiffs Conoco, Inc. (Conoco) and Citgo Petroleum Corporation (Citgo). Defendants cross-move for judgment upon the agency record. This Court has jurisdiction under 28 U.S.C. § 1581(i)(1), (4) (1988) and, for the reasons which follow, enters judgment for defendants.

## I. BACKGROUND

This case is presently before the Court after remand to the FTZB. *See Conoco, Inc. v. United States Foreign–Trade Zones Bd.,* 18 CIT ——, 855 F.Supp. 1306 (1994) (*Conoco III*) (remanding the action to the Board). The dispute underlying this action arises from the Board's decision to impose two conditions upon approving foreign-trade subzone applications for plaintiffs Conoco's and Citgo's crude oil refineries at the Port of Lake Charles, Calcasieu Parish, Louisiana. *See id.* at ——, 855 F.Supp. at 1308–09. The two conditions require Conoco and Citgo

(1) [to pay] duties ... on foreign crude oil used as fuel (or refined into products used as fuel) in the refineries; and

(2) ... [to] elect "privileged foreign status" for foreign crude oil brought into their respective subzones, *i.e.*, elect to pay duties on the value of that crude oil as opposed to the value of refined products produced therefrom.

*Conoco, Inc. v. United States Foreign–Trade Zones Bd.,* 12 Fed.Cir. (T) ——, ——, 18 F.3d 1581, 1583 (1994) (*Conoco II*) (footnote omitted). Plaintiffs Conoco and Citgo initiated this action to challenge the imposition of the foregoing conditions on their subzone grants.

This Court previously remanded the action to the Board because "the Board failed to articulate the basis upon which it decided to impose the challenged conditions on Conoco's and Citgo's subzone grants." *Conoco III,* 18 CIT at ——, 855 F.Supp. at 1312. The purpose of the remand was to allow the Board an opportunity to explain fully "the rationale underlying its decision to condition Conoco's and Citgo's subzone grants" and, in particular, "whether and in what manner the conditions it has imposed on ... [the] grants serve the public interest." *Id.* at ——, 855 F.Supp. at 1312–13.

The Board issued its *Remand Determination* on July 29, 1994. In its *Remand Determination,* the Board set forth its rationale for imposing the two conditions at issue. In brief, with respect to the condition that plaintiffs pay duties on fuel consumed in their subzones, the Board reasoned the Foreign–Trade Zones Act (FTZA or Act) does not shield products consumed in subzones from duties. *Remand Determination* at 1; *see also id.* at 22. The Board added that, even if

the Act afforded such protection, allowing plaintiffs to consume fuel in their subzones duty-free would not be in the public interest "because it would give them an unwarranted economic advantage over other domestic refiners." *Id.* at 2; *see also id.* at 22–23.

As to the second condition requiring plaintiffs to elect privileged foreign status for foreign crude oil brought into their subzones, the Board noted it imposed the condition after considering several factors. Specifically, the Board indicated it considered the following factors: (1) the amount of import displacement that would arise from granting plaintiffs inverted tariff benefits, that is, the extent to which granting inverted tariff benefits to plaintiffs would cause value-added production activity that would otherwise be conducted abroad to occur in the United States; (2) domestic opposition to plaintiffs' subzone applications; (3) an analysis of oil refinery subzones undertaken by the United States Department of Commerce's Office of Energy (Office of Energy); and (4) the inverted tariff savings that would inure to plaintiffs if plaintiffs were to elect non-privileged foreign status for foreign crude entered into their subzones. *Id.* at 16–21; *see also id.* at 2. According to the Board, a review of these factors indicated "there was no public benefit" in allowing plaintiffs "to choos[e] the tariff rate on finished products." *Id.* at 21.

## II. CONTENTIONS OF THE PARTIES

### A. *Plaintiffs*

Plaintiffs challenge the FTZB's *Remand Determination* on several grounds. With respect to the Board's treatment of the first condition, plaintiffs advance three separate arguments. First, plaintiffs contend the Board misconstrued the precedents established by the Court of Appeals for the Federal Circuit (CAFC) and the Customs Court pertaining to the Board's authority to make merchandise consumed within subzones dutiable. (Pls.' Comments at 2–5 (citing *Nissan Motor Mfg. Corp., U.S.A. v. United States*, 12 CIT 737, 693 F.Supp. 1183 (1988), *aff'd*, 7 Fed.Cir. (T) 143, 884 F.2d 1375 (1989); *Hawaiian Indep. Refinery, Inc. v. United States*, 81 Cust.Ct. 117, 460 F.Supp. 1249 (1978), *appeal dismissed*, 66 C.C.P.A. 135

(1979) (*HIRI*)).) According to plaintiffs, *HIRI* indicates the FTZA precludes the Board from making refinery fuel consumed in trade zones dutiable so long as the zone operator (1) enters the crude oil into its zone "for a purpose authorized by the ... Act and (2) the refined products consumed as refinery fuel never enter[ ] ... the Customs Territory of the United States." (*Id.* at 3 (citing *HIRI*, 81 Cust.Ct. at 125, 460 F.Supp. at 1256).) Plaintiffs further argue the decisions of the Court of International Trade (CIT) and the CAFC in *Nissan* "did not overrule or even question the underlying validity of *HIRI* " because, consistent with *HIRI*, the decisions relied on the purpose for which the zone operator entered the merchandise in question to determine whether the merchandise was entitled to duty-free treatment. (*Id.* (citing *Nissan*, 7 Fed.Cir. (T) at 147, 884 F.2d at 1378; *Nissan*, 12 CIT at 740–42, 693 F.Supp. at 1186–87).) Consequently, to the extent the Board asserts *Nissan* overruled *HIRI* to support its position that the FTZA does not authorize a "fuel-consumed" benefit, plaintiffs maintain the Board's position must fail.

Similarly, plaintiffs suggest the Board's interpretation of *Nissan* marks a departure from the Board's past practice of recognizing a fuel-consumed benefit under the Act. As evidence of the Board's change in practice, plaintiffs point to the fact that the Board has not taken steps to have duties imposed on fuel consumed in any of the refinery subzones which the Board approved prior to 1988. Moreover, plaintiffs contend, contrary to the defendants' assertions "[t]he timing of the imposition of the fuel-consumed condition and the *Nissan* decision cast further doubt on the Board's claim that the imposition of the fuel-consumed condition was supported by the Board's long-standing interpretation of the FTZ Act based upon *Nissan*." (*Id.* at 4.) Plaintiffs maintain the Board first imposed a fuel-consumed condition in a subzone grant dated March 31, 1988. (*Id.* (citing *Application of the South Louisiana Port Commission for a Subzone at the Trans-American Natural Gas Corporation*, 53 Fed. Reg. 11,539 (Foreign–Trade Zones Board 1988) (resolution and order approving appli-

cation)).) The *Nissan* decision, however, was issued over four months later.

The third principal contention plaintiffs raise on the issue of the fuel-consumed condition is that this Court must reject the Board's *Remand Determination* as an "impermissible *post hoc* rationalization." (*Id.* at 5 (footnote omitted).) Plaintiffs maintain the Board did not base its *Remand Determination* on the Examiner's Report and the Decision Memorandum which underlie the Board's original determination. Under the Board's internal procedures, plaintiffs claim, "the Examiner's Report and the Decision Memorandum are necessarily the basis for the Board's actions." (*Id.*) Furthermore, plaintiffs argue, counsel for defendants previously asserted "that these documents were in fact the basis for the Board's initial determination." (*Id.*) To further support their claim that the Board's *Remand Determination* constitutes a post-hoc rationalization, plaintiffs underscore the fact that the members of Board who issued the *Remand Determination* "played no part in the original decision." (*Id.* at 6.)

With respect to the Board's treatment of the second condition requiring plaintiffs to elect privileged foreign status for crude oil entered into their subzones, plaintiffs advance two separate arguments. First, plaintiffs contend the Board changed its past practice of freely allowing subzone grantees to elect non-privileged foreign status by requiring plaintiffs to demonstrate why the Board should allow plaintiffs to elect non-privileged foreign status. Plaintiffs charge the Board disregarded that the burden placed on plaintiffs in this case marks a departure from the Board's past practice.

The second argument raised by plaintiffs is that the Board improperly assumed subzone grantees are "entitled only to those zone benefits specifically authorized by the Board." (*Id.* at 7.) According to plaintiffs, subzone grants *by themselves* confer a "full panoply of statutorily authorized zone benefits," including the right to elect non-privileged foreign status. (*Id.* at 8.) Additionally, similar to its argument regarding the burden of proof in this case, plaintiffs maintain the Board's decision to limit plaintiffs' benefits under their subzone grants represents a change in practice.

Finally, plaintiffs pose two general challenges to the Board's *Remand Determination*. Plaintiffs fault the Board for not considering the competitive impact on plaintiffs of requiring plaintiffs to pay duties on fuel consumed in their subzones while the companies' competitors, who obtained subzone status prior to the Board's change in policy, are not required to pay such duties. Additionally, plaintiffs claim the Board did not provide any reasons for imposing the conditions and for diverging from its earlier policies, and did not explain how it acted within the scope of its authority. Even if one assumes the Board did act within the scope of its authority, plaintiffs argue, the alleged factors the Board considered in imposing the conditions amount to nothing more than "a speculative concern that there would be an adverse competitive impact on non-FTZ refiners as a result of an unconditional grant of subzone status to Conoco and CITGO." (Pls.' Reply Comments at 2–3.) Plaintiffs argue the Board's "speculative concern" is not supported by record evidence and, in fact, "is in plain contradiction to the record." (*Id.* at 3–4 (citation omitted).) In sum, based on the foregoing deficiencies underlying the *Remand Determination,* plaintiffs argue the imposition of the challenged conditions is arbitrary and capricious.

### B. *Defendants*

Defendants advance several reasons in support of the Board's decision to impose conditions on Conoco's and Citgo's subzone grants. First, as a general matter, defendants argue the Board has the authority to impose the conditions in question. (Defs.' Comments at 2–3 (citing Defs.' Br. at 17–18).) Defendants claim the FTZA and the Board's regulations authorize the Board "to condition and restrict subzone permits where activities are contemplated that are unauthorized under the Act." (Defs.' Br. at 18.) Additionally, defendants assert case law reviewing the Board's authority indicates the Board has "'wide discretion'" to determine what activities zone operators may undertake, (*id.* at 19 (quoting *Armco Steel Corp. v. Stans,* 431

F.2d 779, 785 (2d Cir.1970)), and "'may impose any condition which it deems advisable upon the continued operation of the refinery in the subzone,'" (*id.* (quoting *HIRI*, 81 Cust.Ct. at 126, 460 F.Supp. at 1257) (citation omitted).).

On the issue of the Board's imposition of a condition making dutiable the fuel consumed by Conoco and Citgo within the subzones, defendants argue the Board acted within the scope of its authority. Defendants claim the FTZA does not exempt fuel consumed in subzones from duties and, therefore, neither creates a fuel consumption benefit nor compels the Board to grant one. (Defs.' Comments at 3 (citing Defs.' Br. at 20–26).) In fact, defendants take "the position that not only is [the Board] *not* compelled to permit this type of benefit, the FTZ Board is proscribed from allowing it." (*Id.* at 3 n. 4; *see also Remand Determination* at 4 ("The FTZ Act does not extend zone benefits to goods consumed in zones....").) Defendants maintain the Act lists various purposes for which a zone operator may enter merchandise into a zone, but does not include the consumption of merchandise or the consumption of fuel among the listed purposes. (Defs.' Br. at 20–21 (citing 19 U.S.C. § 81c (1988 & Supp. II 1990)).) [1] Therefore, defendants urge, "[p]ermitting a fuel consumption benefit would be contrary to the purposes of the FTZA." (*Id.* at 20.)

In regard to the *HIRI* and *Nissan* decisions, defendants argue that while the *HIRI* decision did result in some early applicants claiming the fuel-consumed benefit, "the FTZ Board had never formally 'decided that zone procedures allow parties to avoid Customs duties on goods consumed in zones.'" (Defs.' Comments at 6–7 (citations omitted).) Furthermore, the Board "believes that the rationale of the *HIRI* decision has been undermined by [*Nissan*]." (*Id.* at 7.)

Also in support of the fuel-consumed condition, defendants claim that the imposition of the condition was a reasonable exercise of the Board's authority under the Act. (Defs.' Br. at 26–28.) In particular, defendants note the Act expressly permits the Board to exclude from the zones "any goods or process of treatment that in its judgment is detrimental to the public interest...." 19 U.S.C. § 81o(c) (cited in Defs.' Br. at 26). According to defendants, the term "public interest" is broad enough to encompass the protection of domestic—industry the purpose for which defendants suggest the Board acted. Consequently, defendants claim plaintiffs' position improperly limits the breadth of the Board's well-established authority to account for "domestic concerns when authorizing subzone permits." (Defs.' Br. at 27.)

On the issue of the second condition imposed by the Board that requires Conoco and Citgo to elect "foreign privileged status" for foreign crude oil entered into their subzones, defendants claim the Board's decision to impose this condition also was within its authority. Defendants maintain § 81o(c) of the FTZ Act sets forth both the time frame during which privileged foreign status remains an option for the operator and the consequences of seeking the option within the time frame. Defendants argue that the statute, however, "does *not* establish that the benefit of making such a choice is a *right* of the subzone operator which cannot be curtailed." (Defs.' Comments at 4 (citation omitted).)

Finally, defendants contend the Board did not act arbitrarily or capriciously and did not abuse its discretion in violation of the Administrative Procedure Act (APA). Instead, the Board argues it articulated a "'rational connection between the facts found and the choice made'" by explaining both its decision-making process and its interpretation of

1. The language from § 81c cited by defendants provides:

Foreign and domestic merchandise of every description ... may, without being subject to the customs laws of the United States, except as otherwise provided in this chapter, be brought into a zone and may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this chapter, and be exported, destroyed, or sent into customs territory of the United States therefrom, in the original package or otherwise....

19 U.S.C. § 81c(a) (1988) (other portions of provision updated at Supp. V 1993).

the " 'public interest' mandate contained in the FTZ Act." (*Id.* at 5–6 (citations omitted).) The conditions imposed on the subzone grants, defendants argue, were a clarification, not a change, of existing policy. Defendants contend that, contrary to plaintiffs' assertions regarding purportedly "unconditional" subzone grants to prior applicants, " '[w]hile the FTZ Board Order covering the three refineries [did] not contain *specific* conditions ... [the FTZ Board] consider[ed] them to be restricted in scope based on the form of the requests made.' " (*Id.* at 6 (citing *Remand Determination* at 12–13) (footnote omitted).) Furthermore, as to the subzone applications at issue, defendants maintain the record clearly indicates the Board considered a variety of factors and the input of various agencies and departments in reaching its determination "in light of the public interest standard established by the FTZ Act." (*Id.* at 7 (citing *Remand Determination* at 15).)

## III. DISCUSSION

### A. *Standard of Review*

In *Conoco III,* this Court concluded the standard of review applicable to decisions of the FTZB appears in the APA, 5 U.S.C. § 706 (1988). *Conoco III,* 18 CIT at ——, 855 F.Supp. at 1310–11. Based on the standards prescribed by 5 U.S.C. § 706, the Court indicated it "must first 'decide whether the [Board] acted within the scope of its authority' in order to determine whether the Board's action violated § 706(2)(C)." *Id.* at ——, 855 F.Supp. at 1311 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citation omitted)). The Court further noted "[s]hould [it] decide the Board acted within the scope of its authority, the Court may then consider whether the Board's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' in violation of [5 U.S.C.] § 706(2)(A)." *Id.* at ——, 855 F.Supp. at 1311 (citing *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–25). The relevant provisions of the APA provide:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . . .
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....

5 U.S.C. § 706(2)(A), (C) (1988).

### B. *The Foreign–Trade Zones Board's Authority*

The Court initially examines whether the Board imposed the disputed conditions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Such an examination requires the Court to delineate "the scope of the [Board's] authority and discretion" and to determine whether the action taken by the Board was within the boundaries of its statutorily-derived power. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24 (citation omitted).

To ascertain the scope of the Board's authority and discretion, the Court must first review the parameters of the trade zone laws. The basic function of the zones is to allow operators to enter merchandise into the zones "for the purposes set forth in the statute 'without being subject to the customs laws of the United States.' " *Nissan Motor Mfg. Corp., U.S.A. v. United States,* 7 Fed. Cir. (T) 143, 144, 884 F.2d 1375, 1375 (1989) (quoting 19 U.S.C. § 81c (1982)). The purposes which permit zone operators to enter merchandise duty-free appear in 19 U.S.C. § 81c, which indicates the following in relevant part:

> Foreign and domestic merchandise of every description, except such as is prohibited by law, may, without being subject to the customs laws of the United States,

except as otherwise provided in this chapter, be brought into a zone and may be *stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise or otherwise manipulated, or be manufactured except as otherwise provided in this chapter,* and be exported, destroyed, or sent into customs territory of the United States therefrom, in the original package or otherwise . . . .

19 U.S.C. § 81c(a) (1988) (emphasis added). The effect of the foregoing statute is to "allow[ ] an enterprise operating within [a foreign-trade] zone to take advantage of favorable differentials in the tariff schedules between the rates of duty for foreign materials used in the manufacturing process and the duty rates for the finished articles." *Armco Steel Corp. v. Stans,* 431 F.2d 779, 782 (2nd Cir.1970).

The fact that an entity may operate within a trade zone and enter foreign merchandise into the zone, however, does not shield the entity from all liability for import duties. In *Nissan,* a subzone operator, Nissan Motor Manufacturing Corp., U.S.A. (Nissan), challenged a decision by the CIT granting the United States Customs Service (Customs) summary judgment and denying Nissan's challenge of Customs' imposition duties on foreign machinery entered into the subzone for use in the production of motor vehicles. *Nissan,* 7 Fed.Cir. (T) at 143–44, 884 F.2d at 1375–76. As described by the CAFC, the CIT held " 'imports . . . used or intended to be used to produce motor vehicles' are not within the activities enumerated in 19 U.S.C. § 81c (1982)." *Id.* at 145, 884 F.2d at 1377 (citation omitted). On appeal, Nissan argued the equipment entered into the subzone was not dutiable "because a foreign trade zone is considered to be outside the Customs territory of the United States." *Id.* at 145, 884 F.2d at 1376. Nissan also claimed "merchandise entered into a zone becomes subject to duty only if the merchandise is thereafter sent into the customs territory of the United States." *Id.* at 145, 884 F.2d at 1376.

The CAFC rejected Nissan's position as overbroad. *Id.* at 146, 884 F.2d at 1377. In reaching its decision, the court agreed with the CIT's determination "that Congress signalled its intention to make the imposition of immediate duties dependent on the operations that occur in a foreign trade zone when it listed the activities that could be performed on merchandise brought into a zone." *Id.* at 146, 884 F.2d at 1377. The court added "[t]he fact that a comprehensive listing is set forth in the statute indicates that Congress did not intend a blanket exclusion from Customs duties irrespective of what is done with the imported merchandise." *Id.* at 146, 884 F.2d at 1377. Following the CIT's reasoning, the CAFC held that because Nissan entered the foreign machinery into the subzone for the purpose of consuming the machinery for the production of motor vehicles and such a purpose was not among the operations prescribed by 19 U.S.C. § 81c, Nissan's activities did not permit it to enter the machinery into its subzone duty-free. *Id.* at 147, 884 F.2d at 1378. *Nissan* thus indicates the mere fact that a subzone operator may enter foreign merchandise into its subzone does not automatically exempt the merchandise from duties. In sum, whether merchandise entered into a subzone is exempt from duties will depend upon whether the purpose towards which the subzone operator applies the merchandise is among those listed in 19 U.S.C. § 81c.

Having reviewed the parameters of the trade zone laws, the Court now turns to examining the various bases for the Board's authority. At the outset, the Court notes "Congress has delegated a wide latitude of judgment to the Foreign–Trade Zones Board to respond to and resolve the changing needs of domestic and foreign commerce through the trade zone concept." *Armco,* 431 F.2d at 788. The latitude that the legislature vested in the Board appears in various provisions of the FTZA, especially 19 U.S.C. §§ 81o(c), 81h (1988). Section 81o(c) reads as follows: "The Board may at any time order the exclusion from the zone of any goods or process of treatment that *in its judgment* is detrimental to the public interest, health, or safety." 19 U.S.C. § 81o(c) (emphasis added). Section 81h provides in full: "The Board shall prescribe such rules and regulations not inconsistent with the provisions of this chapter or the rules and regulations of the Secretary of

the Treasury made hereunder and *as may be necessary* to carry out this chapter." 19 U.S.C. § 81h (emphasis added). These two provisions complement the Board's general grants of authority which Congress has set forth in 19 U.S.C. §§ 81b(a), 81g (1988).[2]

The Board has promulgated several regulations which facilitate its administration of the trade zones. The most pertinent of these regulations for the purposes of this action are 15 C.F.R. §§ 400.101, 400.200(a), 400.702 (1986 & 1987). Section 400.101 corresponds to the Board's statutory authority under 19 U.S.C. §§ 81*o*(c) and reads as follows in relevant part:

> Any foreign and domestic merchandise, *except* such as is prohibited by law or *such as the Board may order to be excluded as detrimental to the public interest,* health, or safety may be brought into a zone without being subject to the customs laws of the United States governing the entry of goods or the payment of duty thereon....

15 C.F.R. § 400.101 (emphasis added). Similarly, §§ 400.200(a) and 400.702 mirror the authority the Board derives from 19 U.S.C. § 81h as noted above. Section 400.200(a) provides in pertinent part: "The Board is authorized ... [t]o grant to corporations, *subject to the conditions and restrictions of the act and of the rules and regulations made thereunder,* the privilege of establishing, operating, and maintaining foreign-trade zones...." 15 C.F.R. § 400.200(a) (emphasis added). Section 400.702 indicates in full *"[s]pecial conditions applicable to a particular zone may be required by the Board and inserted in the grant for that zone."* 15 C.F.R. § 400.702 (emphasis added).

Case law pertaining to the FTZA and the Board's role in effectuating the purposes of the FTZA further underscores the breadth of the Board's authority. In *Armco,* the United States Court of Appeals for the Second Circuit considered whether the Board had the authority to establish a subzone that would permit a company to build barge vessels with foreign steel entered duty-free into the subzone and to import the vessels into United States customs territory duty-free from the subzone. *Armco,* 431 F.2d at 781. By operation of 19 U.S.C. § 81c, the subzone grant enabled the operator to avoid duties totalling 7½ *ad valorem* that it otherwise would have had to pay on the steel had it imported the steel directly into the customs territory. *Id.* at 782. The operator was able to enter the completed barge vessels duty-free into the customs territory because such vessels were not subject to the tariff schedule provisions. *Id.*

Armco, a domestic steel producer, challenged the legality of the subzone's establishment. Armco argued, among other points, the Board lacked the authority to grant subzone status to the shipbuilder "because Congress did not intend the creation of a foreign trade zone ... to be used to avoid customs duties when as a result interested domestic industries are placed at a competitive disadvantage." *Id.* at 784. The Second Circuit rejected this argument on the grounds that it involved questions "of policy which are better designed for consideration by the Congress than by a federal court." *Id.* The court went on to note the FTZA

> gives the Trade Zones Board wide discretion to determine what activity may be pursued by trade zone manufacturers subject only to the legislative standard that a zone serve this country's interests in foreign trade, both export and import. Because of the nature and complexity of the problem the factors entering into a Board determination are necessarily numerous, and it would seem incontrovertible that the Board must not be unduly hampered by judicial policy judgments that might cast doubt upon the wisdom of a particular Board decision.

> ....

**2.** The pertinent portion of § 81b(a) reads as follows: "The Board is authorized ... to grant to corporations the privilege of establishing, operating, and maintaining foreign-trade zones in or adjacent to ports of entry under the jurisdiction of the United States." 19 U.S.C. § 81b(a) (1988). Section 81g provides for the following:

"If the Board finds that the proposed plans and location are suitable for the accomplishment of the purpose of a foreign trade zone under this chapter, and that the facilities and appurtenances which it is proposed to provide are sufficient it shall make the grant." 19 U.S.C. § 81g (1988).

... Because of the complexity and vagaries of our highly developed systems of trade, and the pressing needs for varying solutions to the problems that inevitably arise, it is imperative that the Board be permitted to experiment at the fringes of the tariff laws. As long as the Zones Board remains within the fringes and does not stray into areas clearly outside its delegated authority, a court should not interfere except for compelling reasons

. . . .

*Id.* at 785–88 (footnote omitted). After reviewing the various factors underlying the Board's subzone grant, the *Armco* court affirmed the district court's judgment dismissing plaintiff's complaint.

In *HIRI,* the Customs Court similarly emphasized the Board's broad range of authority over the trade zones. *See HIRI,* 81 Cust. Ct. at 126–27, 460 F.Supp. at 1257 (noting the Board's authority to decide whether the FTZA authorizes a particular activity in a subzone). *HIRI* involved a subzone operator's challenge to a decision by Customs to impose duties on foreign crude oil by-products that the operator consumed in its refinery operations. *Id.* at 118–19, 460 F.Supp. at 1251. After determining Customs could not impose duties on subzone entries in order to address an activity undertaken by a subzone operator that Customs considered to be statutorily-unauthorized, the court indicated the agency must seek relief against such activity directly from the Board. *Id.* at 125–26, 460 F.Supp. at 1256–57. The *HIRI* court noted the Board has the power to redress unauthorized activity because its regulations contemplate action by the Board to redress harm caused by "any goods or process of treatment" in a trade zone. *Id.* at 126, 460 F.Supp. at 1257 (quoting 15 C.F.R. § 400.807 (1972)). The court also stressed the Board's ability to "impose any conditions which it deems advisable upon the continued operation of the [subzone facility]." *Id.* at 126, 460 F.Supp. at 1257 (citing 15 C.F.R. § 400.700 (1972)).

None of the arguments plaintiffs raised with respect to the Board's authority to impose the challenged conditions convinces the Court that the Board acted outside the scope of its statutory mandate. Under 19 U.S.C. § 81o(c), the Board has been granted the broad power to exclude from a subzone "any goods or process of treatment that *in its judgment* is detrimental to the public interest, health, or safety." 19 U.S.C. § 81o(c) (emphasis added); *see also* 15 C.F.R. § 400.101 (authorizing entry of merchandise into the trade zones "except . . . such as the Board may order to be excluded as detrimental to the public interest, health, or safety"). If the Board can exclude crude oil completely from a subzone when, in the Board's judgment, the entry of foreign crude into the subzone is "detrimental to the public interest," then the Board certainly may also condition the entry of foreign crude by requiring subzone operators to pay duties on foreign crude oil consumed and to elect privileged foreign status for foreign crude oil brought into the subzone when the Board determines entry without such conditions is detrimental to the public interest. In other words, the Board's broad power to exclude from a subzone "any goods or process of treatment that in its judgment is detrimental to the public interest, health, or safety" under 19 U.S.C. § 81o(c) includes the lesser powers the Board exercised in imposing the two conditions. Furthermore, instead of barring the entry of foreign crude oil into Conoco's and Citgo's subzones altogether, the Board merely precluded the two subzone operators from obtaining trade zone benefits with respect to the foreign crude oil. Such action is analogous to a decision by the Board to deny a subzone grant—a decision that is unquestionably within its authority to make. Accordingly, this Court holds the Board did not exceed its statutory authority by imposing the two disputed conditions on the grants of Conoco's and Citgo's subzone applications.

Furthermore, the Court notes that a fair reading of the CAFC's reasoning of the FTZA in *Nissan* would seem to preclude the Board from allowing a fuel-consumed benefit. As discussed above, the CAFC in *Nissan* agreed with the CIT's underlying determination

that Congress signalled its intention to make the imposition of immediate duties dependent on the operations that occur in

a foreign trade zone when it listed the activities that could be performed on merchandise brought into a zone. The fact that a comprehensive listing is set forth in the statute indicates that Congress did not intend a blanket exclusion from Customs duties irrespective of what is done with the imported merchandise.

*Nissan,* 7 Fed.Cir. (T) at 146, 884 F.2d at 1377. Regarding the imported merchandise at issue in *Nissan,* the CAFC determined

[t]he activities performed by Nissan in the foreign trade zone subzone with the imported equipment are not among those permitted by a plain reading of the statute.... The Act does not say that imported equipment may be "installed," "used," "operated" or "consumed" in the zone, which are the kinds of operations Nissan performs in the zone with the subject equipment.

*Id.* at 146, 884 F.2d at 1377. The CAFC further noted that legislative history of the 1950 amendment to the FTZA explained "[t]he amended proviso *would not authorize consumption of merchandise in a zone,* but would authorize its exportation or destruction without the payment of the liquidated duties and determined taxes thereon." S.Rep. No. 1107, 81st Cong., 1st Sess. (1949), *reprinted in* 1950 U.S.Code Cong.Serv. 2533, 2536 (emphasis added) (quoted in *Nissan,* 7 Fed.Cir. (T) at 146, 884 F.2d at 1377). Based on the above analysis, the CAFC held in *Nissan* that

the importation by Nissan of the machinery and capital equipment at issue into the foreign trade zone subzone was not for the purpose of being manipulated in one of the ways prescribed by the statute. Instead it was to be used (consumed) in the subzone for the production of motor vehicles.... [S]uch a use does not entitle the equipment to exemption from Customs duties.

*Nissan,* 7 Fed.Cir. (T) at 147, 884 F.2d at 1378.

Plaintiffs contend, however, the FTZA does authorize a fuel-consumed benefit. Plaintiffs further contend an earlier decision by the Customs Court, *HIRI,* supports this contention, and nothing in *Nissan* is to the contrary. In *HIRI,* the Customs Court addressed the question of whether *Customs* could impose duties on foreign crude oil "used as an integral part of a permissible manufacturing process within a zone, but which never enters the Customs territory of the United States." *HIRI,* 81 Cust.Ct. at 118, 460 F.Supp. at 1251. In support of Customs' imposition of duties, the government argued "the statutory language [of § 81c] does not specifically authorize foreign merchandise to be 'consumed' as a part of the permissible manufacturing activities within a zone." *Id.* at 121, 460 F.Supp. at 1253. According to the government, because the statute did not authorize such consumption, "the general rule that all foreign merchandise imported into the United States is subject to duty unless specifically exempted, is controlling herein." *Id.* at 121, 460 F.Supp. at 1253.

The Customs Court disapproved of the government's position. The primary basis upon which the court rejected the government's stance was that the foreign crude oil at issue never actually entered the United States customs territory. *Id.* at 121–25, 460 F.Supp. at 1253–56. The court reasoned § 81c

will permit no other interpretation but that merchandise is not subject to the customs laws while in a zone, unless the Foreign Trade Zones Act authorizes their application. [The statute] does not provide, as the Government would contend, that the customs laws are fully applicable to merchandise within a zone except to the extent that the act specifically precludes their application. [The statute's language] clearly attests to the opposite: Exemption for merchandise in a zone from the Customs law is the rule; dutiability for such merchandise under the customs law is an exception which must be specifically provided in some provision of the act. Unless specifically expressed by the Act to the contrary, the transferal of such merchandise to the Customs territory is the occurrence which makes such merchandise dutiable under the Customs laws....

*Id.* at 122–23, 460 F.Supp. at 1254 (footnote omitted).

The second basis underlying the *HIRI* court's decision appears to be that the Board did not condition its grant of subzone status "upon the use of duty-paid fuel to serve as the source of heat in the refining process." *Id.* at 126, 460 F.Supp. at 1257 (citation omitted). The court noted even if the consumption of fuel within a trade zone were an impermissible activity, Customs could not correct such action by imposing duties. *Id.* at 125, 460 F.Supp. at 1256. Instead, the court suggested, Customs should seek redress from the Board which "*may impose any conditions which it deems advisable upon the continued operation of the refinery in the sub-zone.*" *Id.* at 126, 460 F.Supp. at 1257 (citing 15 C.F.R. § 400.700 (1972)) (emphasis added). Because Customs never sought the Board's intervention and accordingly the Board never had occasion to decide whether the subzone operator's fuel consumption in the subzone was authorized under the FTZA, the court concluded the court lacked the authority to decide whether such an activity was permissible under the Act. *See id.* at 125, 460 F.Supp. at 1256 (noting Congress did not intend the court "to become the arbiter of permissible and/or nonpermissible intra-trade zone activity"). In short, the court found it was outside its province "to determine in a proceeding of this character that the use of the instant merchandise, as an integral part of the intrazone refinery operation which was expressly permitted by the Board in issuing the zone permit, constituted an unauthorized activity under the act." *Id.* at 126, 460 F.Supp. at 1257.

After reviewing the *Nissan* and *HIRI* decisions, this Court finds *Nissan*'s interpretation of the FTZA diverges significantly from the interpretation given to the Act by *HIRI.* In *HIRI*, the Customs Court broadly construes 19 U.S.C. § 81c by indicating "[e]xemption for merchandise in a zone from the Customs laws is the rule [and] dutiability for such merchandise under the Customs law is an exception which must be specifically provided in some provision of the act." *Id.* at 123, 460 F.Supp. at 1254. The CAFC's decision in *Nissan*, in contrast, gives a narrow

reading of the statutorily emphasizing "Congress did *not* intend a blanket exclusion from Customs duties [for foreign merchandise entered into a subzone] irrespective of what is done with the ... merchandise [in the subzone]." *Nissan,* 7 Fed.Cir. (T) at 146, 884 F.2d at 1377 (emphasis added). Instead, the appellate court found "*Congress signalled its intention to make the imposition of immediate duties dependent on the operations that occur in a foreign trade zone* when it listed the activities that could be performed on merchandise brought into a zone." *Id.* at 146, 884 F.2d at 1377 (emphasis added). Thus, unlike *HIRI* which interprets the Act to exempt all zone entries from the customs law unless the Act "specifically" provides otherwise, *Nissan* indicates zone entries will be subject to duties *unless* the activity for which the operator makes the entries is among those listed in 19 U.S.C. § 81c.

■ This Court adheres to the interpretation provided by the CAFC in *Nissan.* Thus, whether plaintiffs may enjoy duty-free treatment under the FTZA for fuel consumed in their respective subzones depends on whether the purpose towards which Conoco and Citgo apply the foreign crude oil is among those listed in 19 U.S.C. § 81c. This section provides that foreign and domestic merchandise may be "stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured...." 19 U.S.C. § 81c(a). This provision does not say imported merchandise may be "consumed." *See Nissan,* 12 CIT at 740, 693 F.Supp. at 1186 ("[I]t would distort the statute's plain language to read in other terms such as ... 'consumed.'"). Furthermore, as the CAFC observed in *Nissan,* the legislative history of the 1950 amendment to the FTZA explicitly provides that, "The amended proviso [3] would not authorize consumption of merchandise in a zone...." S.Rep. No. 1107, *reprinted in* 1950 U.S.Code Cong.Serv. at 2535–36. Thus, it appears from the plain language of the statute, the legislative history, and the

**3.** The proviso to which this portion of the legislative history refers removed the FTZA's prior requirement that duties be paid on merchandise

remaining within a zone for over two years. *See* S.Rep. No. 1107, *reprinted in* 1950 U.S.Code Cong.Serv. at 2535–36.

CAFC's decision in *Nissan* that under the FTZA merchandise imported into a subzone for consumption is dutiable. *See Chrysler Motors Corp. v. United States,* 14 CIT 807, 815–16, 755 F.Supp. 388, 396 (1990) ("It has long been established that as a rule of statutory construction, courts should treat the plain language of [the] statute as controlling absent clear legislative intent to the contrary.") (citations omitted), *aff'd,* 10 Fed.Cir. (T) ——, 945 F.2d 1187 (1991).

A key issue arises, however, in plaintiffs' representation to this Court that "the crude oil is first manufactured into other products *before* it is used for fuel." (Pls.' Reply Br. on Pls.' Mot. for J. on Agency R. at 16 n. 12.) The Board takes the position the FTZA "does not extend zone benefits to products consumed in zones, *whether or not they result from a process conducted within zones.*" *Remand Determination* at 1 (emphasis added). Thus, the question at issue is whether crude oil imported, processed, and then consumed in a subzone is imported "for the purpose of being manipulated in one of the ways prescribed by the statute." *Nissan,* 7 Fed.Cir. (T) at 147, 884 F.2d at 1378.

"It is well settled that an agency's interpretation of the statute it has been entrusted by Congress to administer is to be upheld unless it is unreasonable." *U.H.F.C. Co. v. United States,* 9 Fed.Cir. (T) 1, 10, 916 F.2d 689, 698 (1990) (citations omitted); *see American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). Because the FTZA does not make provision for the non-dutiability of merchandise imported for consumption, the agency's interpretation of the FTZA to preclude non-dutiability for "products consumed in zones, whether or not they result from a process conducted within zones"[4] appears reasonable to the Court. Thus, this Court upholds the agency's interpretation.

As to the *Nissan* and *HIRI* decisions, this Court notes that in *Nissan,* the CAFC observed the Customs Court in *HIRI* "did not have to deal with the question at issue [in *Nissan*] of whether the initial entry into the zone was exempt." *Nissan,* 7 Fed.Cir. (T) at 147, 884 F.2d at 1378. This Court further notes the CAFC's observation in *Nissan* that the crude oil in *HIRI* "was entered into a foreign trade zone for manufacture into fuel oil products" and that "[t]his, of course, is an activity delineated by the Act." *Id.* at 147, 884 F.2d at 1378. In this case, however, the Court is abiding by the CAFC's analysis of whether the merchandise at issue is imported "for the purpose of being manipulated in one of the ways prescribed by the statute." *Id.* at 147, 884 F.2d at 1378. Here, the Court sees no evidence that plaintiffs would import crude oil ultimately consumed for any purpose other than ultimate consumption in the subzone, even though that oil must first be processed into the correct form.[5] Furthermore, this Court also notes the *HIRI* court's finding that the question of "[w]hether the use of fuel oil as a secondary and supplemental source of fuel in the refinery of a foreign trade zone constitutes ... a permissible activity or use is a determination to be made by the [Board]." *HIRI,* 81 Cust.Ct. at 117, 460 F.Supp. at 1249.[6]

---

**4.** *Remand Determination* at 1.

**5.** This Court views its finding as thoroughly consistent with that of the CAFC's in *Nissan.* When foreign crude is imported and subjected to a refinery process, some components of the crude are manufactured into materials that may be further refined into finished petroleum products. *See HIRI,* 81 Cust.Ct. at 120, 460 F.Supp. at 1252. These materials are not the subject of the Court's discussion. Instead, the Court is focused on that portion of the crude which "is routed back into the crude oil heater furnace, where it is flared and used as ... [a] source of fuel for the production of heat to run the refinery." *Id.* at 120, 460 F.Supp. at 1252 (footnote omitted). This portion of the crude oil is imported and ultimately consumed just as the machinery in

*Nissan* was imported, installed, and "consumed." Simply because the fuel oil consumed is mixed with other components upon entry and must undergo manufacturing prior to consumption does not negate the fuel oil's ultimate use—consumption.

**6.** The Court notes this holding appears to be what underlies the CAFC's observation in *Nissan* that, "Clearly, in [*HIRI*] the crude oil was exempt at the time of entry." *Nissan,* 7 Fed.Cir. (T) at 147, 884 F.2d at 1378. In other words, whether the crude oil in *HIRI* was exempt at the time of entry was not addressed by the Court; instead, the *HIRI* court determined even if the consumption of fuel within a trade zone were an impermissible activity, Customs could not correct such an action by imposing duties.

## C. *Review of the Board's Action Under the Arbitrary and Capricious Standard*

The Court now turns to the question of whether the Board's imposition of the two conditions on Conoco's and Citgo's subzone grants was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In connection with the arbitrary and capricious standard of review, the scope of review "is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2871, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). "While [the courts] may not supply a reasoned basis for the agency's action that the agency itself has not given ... [the courts must] uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citations omitted).

■ This Court finds the Board acted within these guidelines. The Board explained in its *Remand Determination* the bases for its original determination that approval of plaintiffs' applications was in the public interest only if subject to the two conditions. The Board explained its public interest analysis as follows:

Under its regulations, the FTZ Board reviews proposed zone activity—whether it is conducted in general-purpose zones or subzones—to determine if it is in the public interest. The criteria involves [sic] consideration of the trade policy implications and net economic effect of the proposed activity, taking into account the overall effect on related domestic producers.

*Remand Determination* at 3.[7] The Board further explained most cases involving manufacturing

present no basic policy issues, but all require an economic evaluation. Assessment of the net economic effect involves weighing positive factors (such as increased or preserved employment, U.S. value-added activity, exports and import displacement) against potential negative factors (such as adverse effects on domestic industry that result in the loss of sales to imports of finished products, reduction in employment at plants that use few or no imported components, possible decreases in value-added activity and reduction in domestic supplier purchases, increases in imports, and market distortions). The evaluation includes considering the extent to which zone procedures affect the various factors.

*Id.* at 9.

In its public interest analysis of the two conditions at issue, the Board considered a number of factors. On one of those factors, import displacement, the Board noted "[b]oth the Conoco and Citgo plants ship well over 50 percent of their products into the domestic market, yet there was little evidence of a likelihood of import displacement." *Id.* at 16. Thus, the Board found "at least 88%" of plaintiffs' competition to come from other domestic refineries. *Id.* Advice from government industry analysts, the Board explained, "confirmed the fact that import competition was low and that allowing zone procedures for some refineries would likely disadvantage other domestic refineries." *Id.* at 16–17 (citation omitted).

The Board also considered domestic opposition. *Id.* at 17–18. This opposition focused "on the duty savings related to products that would enter the U.S. market. The major

**7.** The Board indicated it heeded concerns expressed throughout congressional committee hearings held in the late 1980s and studies performed by the United States General Accounting Office and the International Trade Commission. *Remand Determination* at 8. Concerns centered around "potential adverse impact on domestic industry resulting from zone savings on products destined for the U.S. market." *Id.* "[R]ecommendations made to the FTZ Board call for a careful review that results in granting zone benefits on products manufactured in zones for importation only when there is no trade policy conflict and there is evidence of a clear net positive economic effect and no adverse effect on domestic industry." *Id.* at 8–9.

zone savings of concern thus involved fuel consumed and inverted tariffs." *Id.* at 17. Apparently, savings resulting from fuel consumed and inverted tariffs "could be significant enough to pose competitive problems in a low margin industry such as this one." *Id.* at 17–18 (footnote omitted).

Finally, the Board indicated in the *Remand Determination* that it considered analyses by the Office of Energy. The Board reported in the *Remand Determination* that the analyses indicated substantial refinery production in the area in question would compete with domestic products due to the low level of refinery product imports. *Id.* at 18 (quoting from the analyses). The Board further reported the analyses indicated duty-free treatment of refinery fuel would provide benefitted refiners with a "small but clear" financial advantage over non-benefitted refiners. *Id.* at 19 (quoting from the analyses).

Specifically as to the imposition of the condition requiring plaintiffs to pay duties on foreign crude oil used as fuel, the Board explained that after considering the record, domestic industry opposition, and Office of Energy analyses, the Board

> concluded that granting such a cost savings to refiners that use foreign crude oil would give them an unwarranted advantage over refiners that use domestic crude oil. . . . [T]he fact that the level of imports of finished oil products was low meant that the competitive impact of the savings would be greater on other domestic producers than on foreign refiners, resulting in a net negative economic effect.

*Id.* at 23. Accordingly, the Board concluded "approval of this benefit would not have been in the public interest." *Id.*

As to imposition of the condition requiring plaintiffs to elect privileged foreign status for foreign crude oil brought into the subzones, the Board explained that notwithstanding improper omissions of information necessary to complete a request for inverted tariff benefits, the Board considered this benefit in both cases. *Id.* at 21.[8] The Board considered the

"impact on domestic production and employment, import displacement, domestic value-added activity, and the extent of import competition taking into account the concerns expressed by domestic industry." *Id.* The Board found

> there would be some positive effects from the savings attributable to exports and that there would be no harmful effect in granting duty-deferral on imports. However, there was no public benefit basis to extend zone authority to choosing the tariff rate on finished products on which the rate was lower (inverted tariff benefit). The record indicated that because of the low level of import competition, little displacement of imported products would occur. Most of the impact would be at the expense of other domestic refineries.

*Id.* The Board explained it considered the possibility that any savings from inverted tariff benefits might be low. *Id.* The Board concluded, however, "even a small savings advantage would be significant in a low margin industry such as this one." *Id.*

In light of the public interest analysis described above, the Board granted the subzone applications, but also imposed the two disputed conditions. Adoption of conditions, the Board explained, "is a preferred alternative to denying applications in their entirety, when a significant part of the positive effects can be realized if the negative effects are averted through conditions." *Id.* at 2–3. In plaintiffs' cases, "[t]he conditions in question serve the public interest because they allow zone activity to be conducted to the extent that it is within the scope of authority covered by the FTZ Act, and results in a net positive economic effect, taking into account the overall effect on U.S. industry." *Id.* at 2.

The Court finds these explanations both articulate satisfactorily the Board's determination to impose the two disputed conditions, and include " 'a rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103

---

8. The Board stated in the *Remand Determination* that "[w]ith respect to the inverted tariff savings, the applications and later statements by the applicants were ambiguous and inconsistent. . . . Notwithstanding such omissions and lack of clarity, inverted tariff savings were given consideration in both cases." *Remand Determination* at 19–21.

S.Ct. at 2871 (citation omitted). The Court finds plaintiffs' argument that the *Remand Determination* must be rejected as "a revisionist 'explanation' of the prior Board's decision" based on "a rationale ... fundamentally different from the grounds previously relied upon by the Board" and performed by "the current Board, comprised of individuals who played no part in the original decision" of no import. (Pls.' Comments at 5–6.) In *Trent Tube Div., Crucible Materials Corp. v. United States,* 14 CIT 780, 752 F.Supp. 468 (1990), *aff'd sub nom. Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB,* 10 Fed.Cir. (T) ——, 975 F.2d 807 (1992), this Court addressed and rejected an analogous argument aimed at the International Trade Commission (ITC).[9] The Court agreed with prior case law that "the ITC 'is a continuing institution, regardless of changes in its membership.' " *Id.* at 789, 752 F.Supp. at 476 (quoting *SCM Corp. v. United States,* 2 CIT 1, 7, 519 F.Supp. 911, 915 (1981)). "Moreover, membership changes within the [ITC] 'do[ ] not affect its power to discharge its statutory duties.... " *Id.* at 789, 752 F.Supp. at 476 (quoting *Sprague Elec. Co. v. United States,* 2 CIT 302, 309, 529 F.Supp. 676, 682 (1981)). The Court finds *Trent Tube* sufficiently analogous and, indeed, controlling here. Furthermore, in the *Remand Determination,* the Board adequately described its decision-making process on zone applications and included an explanation of where an examiners committee report and final decision "package" fit in. *Remand Determination* at 5–8. The Board reports in the *Remand Determination* that the process outlined "was followed in both the Conoco and Citgo cases." *Id.* at 8.

The Court disagrees with plaintiffs' argument that imposition of the two conditions represents a change in agency practice. The Board explained past grants of subzone ap-

plications as follows. The Board's subzone grants fall into two categories: pre–1986 and post–1986. *Remand Determination* at 12. The pre–1986 subzone grants fall into two subcategories. *Id.* The first two approvals

were special cases from the standpoint of oil policy and economic considerations based on their insular locations (HIRI, Hawaii, and Conoco, Puerto Rico) and they were not considered precedents for U.S. mainland sites. Concerns about competitive effects were minimal because these refineries were designed to serve export and local markets and they did not have direct access to the pipeline system of the contiguous states.

*Id.* The second sub-category of pre–1986 subzone grants involved three Texas oil refineries whose applications were approved "mainly based upon the potential for increased export activity." *Id.* (citation omitted). These three applications, however,

were limited in scope. Zone savings were requested for export activity and duty deferral, but not for inverted tariff savings. Thus, [the Board] did not view inverted tariff benefits as being within their scope of authority. While [the applicants] made reference to possible savings on fuel consumed, [the Board] did not specifically authorize such a benefit because [the Board] considered it an issue to be determined by U.S. Customs. There was no opposition from domestic industry. While the FTZ Board Order covering the three refineries does not contain *specific* conditions as do the post–1986 cases, [the Board] considers them to be restricted in scope based on the form of the requests made in the applications.

*Id.* at 12–13.

Cases in which companies sought subzone grants after 1986 "involved a number of re-

---

**9.** In *Trent Tube,* this Court addressed a challenge to a remand determination issued by the International Trade Commission (ITC). After issuance of the original determination but prior to the issuance of the ITC's remand determination, one of the ITC Commissioners was replaced by a new Commissioner. *Id.* at 781, 752 F.Supp. at 470. While the remaining Commissioners readopted their respective views on remand, the new Commissioner's determination differed from that of his predecessor. *Id.* at 781, 752 F.Supp. at 470.

As a result of the new Commissioner's determination, the remand determination became affirmative while the original determination had been negative. *Id.* at 781, 752 F.Supp. at 470. Following the remand, one party argued that because the original determination had been sustained in all respects except a portion of the replaced Commissioner's views, the remand instructions were limited to providing an adequate explanation of those views. *Id.* at 782, 752 F.Supp. at 471.

fineries seeking a wider range of zone savings. Unlike previous cases, these were opposed by other domestic refiners ... and the American Independent Refiners Association." *Id.* at 13. An Office of Energy review performed at the Board's request "concluded that allowing [lower tariffs and fuel consumed] savings for refineries that use foreign crude oil would give them an unwarranted advantage over refiners that use domestic crude. The Office of Energy analyses concluded that granting zone authority for other than exports raised the potential for negative effects on domestic producers." *Id.*

Issues concerning Customs control requirements also affected the likelihood of exercise of the inverted tariff benefit. *Id.* 13–14 (pointing to a 1988 ITC report noting "certain Customs problems in devising adequate control procedures because of the complexity of the activity proposed and the nature of the refinery process") (citation omitted). Based on experimental projects and meetings with subzone applicants, Customs designed a proposed operational module for all refinery subzones. *Id.* at 14. Under Customs' proposed module, all crude oil would be placed in non-privileged status or entry would be made after the first stage of refining. *Id.* Upon objection by the operators and applicants, "Customs settled on an interim plan that called for all incoming crude being placed in privileged foreign status" as a "first-step that provided the majority of benefits sought and [diminished] interest in inverted tariff benefits." *Id.*

According to the Board's *Remand Determination*, its first post–1986 case was a 1988 decision involving a TransAmerican refinery in Gramercy, Louisiana. *Id.* The grant of the subzone application "contained restrictions on fuel consumed and inverted tariff savings, setting the stage for the cases that followed." *Id.* The five approvals that followed in 1988 and 1989, including the approvals for Conoco and Citgo, contained the same restrictions. *Id.* at 14–15. Between 1991 and 1994, the Board approved five more re-

finery subzones, all subject to the fuel consumed and inverted tariff restrictions. *Id.* at 15. Thus, the Board explains, it "adopted the fuel and inverted tariff restrictions for each of the eleven subzones approved since March 1988." *Id.*[10]

Based on the Board's explanation set forth in the *Remand Determination* and outlined above, this Court rejects plaintiffs' contention that imposition of the challenged conditions constituted a change in agency practice. Each subzone application brings different facts and circumstances. The Board must be able to consider and adjust to the different facts and concerns each new application presents, and to render a decision accordingly. *See, e.g., Armco Steel Corporation v. Stans,* 431 F.2d 779, 788 (1970) ("Because of the complexity and vagaries of our highly developed systems of trade, and the pressing needs for varying solutions to the problems that inevitably arise, it is imperative that the Board be permitted to experiment at the fringes of the tariff laws."). In so doing, the Board exercises the authority granted to it by the FTZA. *See supra* part III.B; *see also Armco,* 431 F.2d at 788 ("Congress has delegated a wide latitude of judgment to the Foreign–Trade Zones Board to respond to and resolve the changing needs of domestic and foreign commerce through the trade zone concept."). Imposition of the two conditions when the Board determined grants without the conditions would not have served the public interest was an act entirely within the Board's scope of authority. *See supra* part III.B. Furthermore, "public interest" is a broad and ever-changing phrase. That which comprises "public interest" today perhaps will not tomorrow. As long as the factors the Board considers in its public interest determination are reasonable, the Court will defer to the Board. *See U.H.F.C. Co. v. United States,* 9 Fed.Cir. (T) 1, 10, 916 F.2d 689, 698 (1990) ("It is well settled that an agency's interpretation of the statute it has been entrusted by Congress to adminis-

---

**10.** The Board adds that in the three most recent cases, it granted one exception with regard to sulfur. *Remand Determination* at 15. The Board reported this exception was possible because: (1) the applicant submitted new information indicat- ing relatively high sulfur import levels; (2) the Board found significant foreign competition in sulfur; and (3) the Board found no adverse effect on domestic producers. *Id.*

ter is to be upheld unless it is unreasonable.") (citations omitted). Moreover, as the Second Circuit recognized in *Armco:*

> Because of the nature and complexity of the problem the factors entering into a Board determination are necessarily numerous, and it would seem incontrovertible that the Board must not be unduly hampered by judicial policy judgments that might cast doubt upon the wisdom of a particular Board decision....
>
> . . . .
>
> ... As long as the Zones Board remains within the fringes and does not stray into areas clearly outside its delegated authority, a court should not interfere except for compelling reasons....

*Armco,* 431 F.2d at 785–88 (footnote omitted). Finally, as discussed above, the Board has articulated satisfactorily its rationale behind the imposition of the two conditions in the particular applications at issue. Accordingly, this Court rejects plaintiffs' arguments concerning an alleged change in agency practice.

The Court further finds unpersuasive plaintiffs' contentions the Board changed its past practice by reversing the burden of proof on applicants seeking inverted tariff benefits, and that subzone grants *by themselves* confer a "full panoply of statutorily authorized ... benefits." (Pls.' Comments at 7–8.) As the Court found in its analysis of the Board's statutory authority, Congress granted to the Board the power to impose conditions on subzone grants when the Board finds that a grant without the conditions would not serve the public interest. As to the burden of proof, the Board explained in the *Remand Determination* that "[i]n both cases, when the matter of choosing duty rates on finished products was discussed, *the applicants were advised* that such authority could not be granted without detailed product-by-product information...." *Remand Determination* at 4–5 (emphasis added).[11] Yet, the Court notes, the Board reported plaintiffs "never fully supplied the information needed, nor did they make it clear in-

verted tariff benefits were being requested." *Id.* at 5.

Finally, the Court turns to plaintiffs' arguments regarding the Board's consideration of economic factors. First, plaintiffs contend the Board failed to consider the negative economic consequences for plaintiffs in that other subzone operators have a fuel-consumed benefit. Second, plaintiffs claim the Board's concern about the adverse competitive impact on non-FTZ refiners as a result of an unconditional grant to plaintiffs amounts to nothing more than "speculative concern" unsupported by record evidence and, in fact, is "in plain contradiction to the record." (Pls.' Reply Comments at 3–4.) As to plaintiffs' first contention, as discussed above the Court will defer to the Board's definition of factors to be considered in the "public interest" as long as those factors are reasonable. Here, the Board informs the Court through the *Remand Determination* that the grant of a fuel-consumed benefit to plaintiffs would create an "unwarranted economic advantage over other domestic refiners that use only domestic crude inputs." *Remand Determination* at 2. The Court finds even if the Board did not consider alleged negative economic effects on plaintiffs, the Board's determination that granting a fuel-consumed benefit would cause an economic disadvantage to other refiners is sufficient to constitute a finding that the grant would not be in the *public* interest. *See* 19 U.S.C. § 81o(c) ("The Board may at any time order the exclusion from the zone of any goods or process of treatment that *in its judgment* is detrimental to the *public* interest, health, or safety.") (emphasis added).

As to plaintiffs second contention, plaintiffs quote passages from Office of Energy memoranda to support their claim that "[t]he record ... highlights the *de minimis* impact of the fuel-use and inverted tariff benefits." (Pls.' Reply Comments at 4 (citations omitted).) The Court finds this argument unpersuasive. Simply because the Office of Energy may have reached a different conclusion concerning the ultimate effect on competition does not mean the Board had to reach the

---

11. The Board explained it requires this information so that the Board "can assess economic impact from both a domestic and world market perspective." *Remand Determination* at 5.

same conclusion or that the Board could not agree with other findings in the analyses. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by *substantial evidence.*") (emphasis added) (citations omitted). The Board, and not the Office of Energy, is charged with administering the FTZA. *See* 19 U.S.C. § 81b(a). For all of the reasons discussed above, the Court finds the Board's imposition of the two disputed conditions was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### IV. CONCLUSION

After considering all of the parties' contentions, the Court holds: (1) The Foreign–Trade Zones Board has the authority to impose conditions on the grant of a foreign trade subzone application which require subzone operators to (a) pay duties on foreign crude oil consumed in their subzones and (b) elect "privileged foreign status" for foreign crude oil entered into their subzones; (2) the Foreign–Trade Zones Board decision to impose the foregoing conditions was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A); (3) plaintiffs' motion for judgment on the agency record is denied; (4) defendants' cross-motion for judgment on the agency record is granted; and (5) plaintiffs' action is dismissed.